800 So.2d 938 (2001)
STATE of Louisiana
v.
Dennis A. GAAL.
No. 01-KA-376.
Court of Appeal of Louisiana, Fifth Circuit.
October 17, 2001.
*940 Paul D. Connick, Jr., District Attorney, Churita H. Hansell, Terry M. Boudreaux, Appellate Counsel, Joseph A. Aluise, Trial Counsel, Gretna, LA, Counsel for State of Louisiana, Plaintiff-Appellee.
Leroy A. Hartley, New Orleans, LA, Counsel for Dennis A. Gaal, Defendant-Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., SUSAN M. CHEHARDY and WALTER J. ROTHSCHILD.
ROTHSCHILD, Judge.
On June 29, 1999, the defendant, Dennis Gaal, was charged in a two-count bill of information with one count of sexual battery upon a juvenile, in violation of LSA-R.S. 14:43.1, and one count of aggravated oral sexual battery upon a juvenile, in violation of LSA-R.S. 14:43.4.[1] He was arraigned on December 27, 1999 and pled not guilty. On January 6, 2000, the defendant filed various pre-trial motions, including a Motion to Suppress Statements and/or Confessions and a Motion to Suppress Evidence. On August 14, 2000, the State filed two Motions in Limine. One of these motions sought to exclude reference to criminal charges brought in another parish against this defendant for alleged sexual abuse of this victim. The second motion sought to exclude reference to an alleged act of child abuse by this victim's uncle against another child.
On April 4, 2000, a hearing was held on the Motions to Suppress Statements and Evidence. After hearing testimony, the trial court ruled that the audiotape and transcription of the defendant's statement to police was admissible. The trial court *941 heard additional testimony and thereafter ruled that the audiotape of the defendant's threatened suicide was admissible. Finally, the trial court heard testimony concerning the videotaped interview of the victim. The trial judge ruled that the State had proven the authenticity of the videotape, but he reserved ruling on its admissibility until he viewed the tape and had a hearing on the competency of the victim.
On July 20, 2000, a hearing was held to determine the competency of the victim. The victim testified and was examined by the State, the defendant, and the trial judge. Prior to the trial court's determination, the defendant sought to admit into evidence the transcript of another competency hearing in another state court involving this victim, and the trial judge denied the request. Thereafter, the trial judge found that the victim was competent to testify at trial. The trial judge also viewed the videotaped interview of the victim and found it to be admissible.
Trial was conducted on August 14-16, 2000. On the first day of trial, the State and the defendant presented arguments concerning the State's two Motions in Limine. The trial court granted both motions. At the conclusion of the trial, a six-person jury found the defendant guilty as charged on both counts.
On October 5, 2000, the defendant was sentenced to serve five years of imprisonment at hard labor without the benefit of parole, probation or suspension of sentence on Count 1 and five years of imprisonment at hard labor without the benefit of parole, probation or suspension of sentence on Count 2. The sentences were ordered to run consecutively and he was given credit for time served. Thereafter, the trial judge heard and denied the defendant's motion for a new trial. That same day, the defendant filed a Motion for Appeal and it was granted by the trial court.

FACTS
At the trial of this case, the State called D.P., D.P.'s mother, Anita White, Officer McGregor, Omalee Gordon, and Dr. Scott Benton to testify.
Dawn[2], who is the mother of D.P., testified that she was engaged to Gary Miller, and that she first moved in with him when her son was two years old. Six months later, a friend, Dennis Gaal, came to live with them in Chalmette. The three adults and the child lived together at that location for seven to eight months at which time Gary, Dawn and D.P. moved away. In May 1998, Gary, Dawn and D.P. moved into an apartment in Kenner. They remained at that location until April 1999. Dawn testified that during this time, Gaal visited frequently, often babysat D.P., and frequently spent the night on the sofa at their apartment.
Anita White testified that she was a friend of Dennis Gaal. She stated that she and her husband had attended school with him and knew him by the name "Spanky." According to Ms. White, in April 1999, Gaal told her that he had something to tell her and that she would not like what he had to disclose. Ms. White inquired whether Gaal had killed anyone and he told her no. She next asked if he had raped anyone. Ms. White testified that Gaal responded that it depends on your definition of "rape." Ms. White told Gaal that she did not care to hear what he had to say. Later that evening, Gaal disclosed to her that he was gay and that he had sex with someone who was very young. Ms. White was aware that he had lived with Gary and Dawn, so she asked if it was D.P. According to Ms. White, Gaal admitted *942 having had sex with D.P., and he told her that he would kill himself before he would go to jail. Ms. White told Gaal to tell the child's mother, because she would tell her if he didn't.
The defendant went to Dawn and Gary and told them that D.P. had been making sexual advances toward him and that, at age two years, D.P. had asked Gaal to sexually fondle him. The next day, Gaal called Ms. White and told her that he had told Dawn of their encounter and that she was going to get help for D.P.
Gaal's revelation shocked Dawn and she confronted her son, D.P., about the allegations. According to Dawn, she asked her son if he had touched Gaal's "ding-aling," which is the word used by the child for penis. D.P. responded "no mama, he's been doing it to me." When asked to explain, D.P. said "He put his ding-a-ling in my mouth and he made me put my ding-aling in his mouth and he pee'd on me." The child told his mother that this happened in the bedroom when she went to get Gary from work.
Approximately two weeks following Gaal's revelation to Ms. White, Dawn and Ms. White were together socially at Gary's mother's house. Dawn mentioned that Gaal had told her that D.P. was making sexual advances toward him and Gaal felt that someone was molesting the child. At that point, Ms. White realized that Gaal had not told Dawn what he had told her, and she revealed to Dawn what Gaal had previously told her. Dawn and Gary decided to call a family meeting with Ms. White present so that Ms. White could confront Gaal with his prior disclosure to her.
On April 14, 1999, the family meeting was called with Gary, Dawn, Anita White and her husband, Jody and Allen Miller, and Dennis Gaal in attendance. During the meeting, Ms. White relayed what she had been told by Gaal. Ms. White testified that Gaal shook his head and kept saying "I guess I'm guilty." Gaal then told the group that he was the victim and that he did nothing wrong. He told the gathering that he had awakened to find D.P. naked in his bed and the child told him he's "putting it in the hole." Upon questioning, Gaal admitted that he "allowed" D.P. to perform oral sex on him. Gaal was told to admit himself into a hospital or the police would be called.
On April 16, 1999, Dawn called the Kenner Police. Detective Brian McGregor, a detective with the Kenner Police Juvenile Division, proceeded to their residence in Kenner. Detective McGregor testified that he first spoke with Dawn alone, while D.P. was playing in another room, and he learned that D.P. had disclosed that he was sexually abused by "Spanky." Dawn gave the officer the specifics of the allegations as she knew them. Thereafter, D.P. was independently interviewed. He told the policeman that "Spanky" put his "ding-a-ling in his mouth and pee'd on him." Officer McGregor then arranged for the child to be interviewed by a forensic interviewer with the Child Advocacy Center.
Officer McGregor testified that on April 27, 1999, he drove Dawn and D.P. to the Child Advocacy Center. The child was brought in by his mother. Once the child was comfortable, Dawn left the interview room. Only the interviewer and D.P. were in the room at the time of the interview. The child's permission was sought to videotape the interview and he agreed. Officer McGregor listened on a monitoring device outside the examination room. Drawings were used by the child to clarify the information given. The information given in the interview was consistent with the information given at the time of the police report.
*943 On May 20, 1999, a forensic pediatrician, examined D.P. The child told him that he was there to talk about "Spanky." During the history given by D.P., he said that the perpetrator put his penis in the victim's mouth and licked the victim's penis. D.P. also said that "Spanky pee'd on me and sucked my ding-a-ling." The child indicated that his "ding-a-ling" was his penis, by pointing to his private area. D.P. stated that Spanky put his ding-a-ling in D.P.'s mouth and shook it. Finally, the child told the doctor that "Spanky" put his finger in the child's rectum.
Cultures of the child's mouth, throat, and rectum were taken, and the results were negative. No bruises, tears, or redness was found, and the physical exam was consistent with the history. In explaining these findings, the doctor said that he saw the child some time after the assault and thus, he was not surprised that the physical findings were normal.
The defendant presented testimony of Lois Maynard, who is the defendant's godmother, his parents, Lynell and Martin Gaal, and Carol Ewing, who is the victim's paternal grandmother. The defendant also testified in his own defense.
Carol Ewing relayed a story at trial about how she found the victim acting out sexually one day when he was in her care. Ms. Ewing had left D.P. playing with his two young cousins, and when she returned to check on them, she found D.P. with his pants down. She asked him what he was doing and he said he was trying to get his cousins to lick his penis. He said that the dog "Shorty" does this. According to Ms. Ewing, on a second occasion she saw D.P. expose himself to his cousin and she corrected him. The witness admitted that the incidents occurred after the abuse involving the defendant.
Under cross-examination, Ms. Ewing admitted that D.P. had told her that Spanky hurt him and pee'd on him. The child told her the defendant put his finger in the child's behind. D.P. also told Ms. Ewing that he cried and asked the defendant to stop and he would not, and that the defendant brought him a toy.
Lois Maynard testified during the trial about a conversation she overheard between Dawn and Dawn's mother, while she was shopping in K-Mart. According to Ms. Maynard, Dawn was overheard telling her mother that they were not going to charge Gaal in St. Bernard, but she thought that they would charge him in Jefferson Parish. Ms. Maynard also said that Dawn stated to her mother that she did not want to hurt the defendant, but she had to cooperate, or she would lose her child.
Martin Gaal, the defendant's father, testified that the victim, his mother and Gary had visited Mr. Gaal's home with the defendant on several occasions. On two occasions, Martin Gaal testified he had found D.P. naked in the hallway, early in the morning. According to Martin Gaal, he told the child to go tell his mother to put his clothes on.
The defendant testified that he began living with Gary Miller before 1997. Dawn and D.P. moved in with them in January 1997 when D.P. was two and one-half years old. He babysat the child on numerous occasions and occasionally bought toys for him. Gaal stated that when D.P. was two and one-half years old, Gaal was giving the child a bath and, according to the defendant, the child asked Gaal to touch his penis. Gaal said he refused and asked D.P. if anyone had ever done that. Gaal said the child told him yes, his "Paw Paw Tony." Gaal thereafter asked the child's mother what was the name of D.P.'s "Paw Paw" and she gave another name. He did not tell D.P.'s mother about the *944 incident that allegedly occurred during the child's bath.
Gaal testified that three nights after this incident, he awoke to find D.P. playing with Gaal's genitals. He stated that he ran the child away, but again he did not tell the child's mother. According to the defendant, he held all this information inside and it caused him to have a nervous breakdown, lose his job, and return to live with his parents.
The defendant testified that in April 1998, he spent five nights with Dawn and Gary, and he slept on the sofa. One night D.P. came in and was naked, so Gaal asked him what he was doing. According to Gaal, the child replied that he was "putting my dingy in the hole." Gaal said that he ran the child away again, but he never told anyone about the incident.
Gaal stated that this same series of events occurred three more times between D.P. and himselfonce when Gaal was staying nearby at Gary's brother's house, once on the night before Thanksgiving, and once around January 1999. Each time the defendant's response was to run the child away but not to tell his mother. The defendant said he was emotionally distraught and, thereafter, he refused to babysit D.P.
According to Gaal, he confessed to Anita White that he was gay and that he awoke to find D.P. in his bed fondling Gaal's genitals. Gaal said Ms. White told him to tell the child's mother because, if he didn't, she would.
Gaal testified that he went to Gary and told him that he had awakened to find D.P. fondling Gaal's genitals. According to Gaal, he also told Gary that the child had told him that his "Paw Paw Tony" taught him this. Gaal said that he told Gary about the four times that he awoke to find the child naked and in his bed. The child's mother later informed Gaal that the child had accused Gaal of sexual abuse.
Gaal testified that on April 14, 1999, he was summoned to Dawn's house for a family meeting. Once there, Anita White told him that she could not believe that Gaal had called her a liar. Dawn said that she wanted to hear Gaal's side of the story and he told Dawn what he had told Gary. Ms. White responded that Gaal had not told them the same thing that he had told her.
Gaal testified that after this incident he felt that he had lost all of his friends and he contemplated suicide. He took an overdose of medicine and made a farewell tape, and then he admitted himself to Charity Hospital.

LAW AND DISCUSSION
Although he did not designate it as a specific assignment of error, the defendant argues in his brief that the evidence presented was insufficient to convict him of the charged offenses. He asserts that the State failed to establish, by direct evidence, any criminal conduct between himself and the alleged victim. The State argues that the essential elements of each offense were proven beyond a reasonable doubt. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court will first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992).
In order to determine whether the evidence is sufficient to sustain a guilty verdict, an appellate court must decide whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d *945 78, 82. A determination of the weight of the evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of a jury only to the extent necessary to assure that the defendant had received due process of law. State v. Bordenave, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to reweigh the evidence or assess credibility. State v. Lewis, 98-447 (La.App. 5th Cir.10/28/98), 720 So.2d 1230, 1233.
In this case, the defendant, Dennis Gaal, was charged in Count 1 with sexual battery upon a juvenile "by touching the genitals of the juvenile." The crime of sexual battery is defined, in pertinent part, as follows:
LSA-R.S. 14:43.1. Sexual battery
Sexual battery is the intentional engaging in any of the following acts with another person, who is not the spouse of the offender, where the offender acts without the consent of the victim, or where the other person has not yet attained fifteen years of age and is at least three years younger than the offender:
(1) The touching of the anus or genitals of the victim by the offender using... any part of the body of the offender; or
(2) The touching of the anus or genitals of the offender by the victim using... any part of the body of the victim.
In Count 2 of the bill of information, the defendant was charged with aggravated oral sexual battery, "by placing the juvenile's penis in his mouth and/or placing his penis in the juvenile's mouth." The crime of aggravated oral sexual battery is defined, in pertinent part, as follows:
LSA-R.S.14:43.4. Aggravated oral sexual battery.
Aggravated oral sexual battery is an oral sexual battery committed when the intentional touching of the genitals or anus of one person and the mouth or tongue of another is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
. . . .
(4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense.
At the time of the offenses, the victim was three-four years old and the defendant was 23-24 years old. At the time of trial of this matter, the victim was six years old and the defendant was 25 years old.
The victim testified that the defendant touched his "private" with the defendant's finger and ejaculated on the child's "private." The child also testified that the defendant put his mouth on the child's "private." The victim's mother testified that after her initial discovery of alleged abuse, she asked the child about it and was told that the defendant had put his penis in the child's mouth, the child was made to put his penis in the defendant's mouth, and the defendant ejaculated on him. Anita White testified that Gaal admitted to her that he had "sex" with D.P. He also admitted to her that he allowed the victim to perform oral sex upon him.
Officer McGregor testified that the child told him that the defendant put his penis in the child's mouth and ejaculated on him. The forensic interviewer testified that the victim told her that the defendant put his finger into the child's rectum. The physician testified at trial that the child told him that the defendant put his penis in the child's mouth and licked the child's penis. The child also told the doctor that Gaal *946 sucked his penis and ejaculated on him. Finally, D.P. told the doctor that the defendant put his finger in the child's rectum.
The defendant denied sexually assaulting the victim and he continued to allege that the victim made sexual advances towards him.
It is clear from a review of the record that the jury, when faced with a conflict in the evidence presented by the State and the defendant, chose to believe the testimony of the victim and other State witnesses regarding the sexual abuse of D.P. and to disbelieve the defendant's testimony denying the abuse. This is a credibility determination that will not be disturbed on appeal.
Viewing the evidence in the light most favorable to the State, it is clear the State proved the essential elements of the crime of sexual battery, pursuant to LSA-R.S. 14:43.1, beyond a reasonable doubt. Moreover, viewing the evidence in the light most favorable to the State, the record demonstrates that the State proved the essential elements of the crime of aggravated oral sexual battery, pursuant to LSA-R.S. 14:43.4, beyond a reasonable doubt.
The evidence contained in the record was clearly sufficient to convict the defendant of the charged offenses. Accordingly, the defendant's argument that the evidence is insufficient is without merit.
In his first designated assignment of error, the defendant argues that the trial court erred in finding the victim competent to testify because he could not respond to some questions, he was unable to distinguish between right and wrong, and was unable to discern the difference between what he saw and what was told to him. The State alleges the testimony presented supports the trial court's finding of competency.
In State v. Troulliet, 94-183 (La.App. 5 Cir. 9/14/94) 643 So.2d 1267, 1270, this Court discussed the issue of competency, within the context of a child sexual abuse case:
The law regarding the competency of a witness is quite clear. Every person of proper understanding is competent to be a witness except as otherwise provided by legislation. Understanding, and not age, is the test of whether any person shall be sworn as a witness. A key determination to be made is whether the witness is able to understand the difference between truth and falsehoods. The determination of the trial court that a child is competent to testify as a witness is based not only upon the child's answers to questions testing his or her understanding, but also upon the child's overall demeanor on the witness stand.
(Citations omitted). See also, LSA-C.E. art. 601.
In State v. Foy, 439 So.2d 433, 434 (La. 1983), the Louisiana Supreme Court noted that a child's hesitation or unresponsive answers do not necessarily indicate incompetence, but rather, may be part of an overall demeanor in an unfamiliar courtroom situation that favorably reflects testimony only as to what is clear to the child.
A trial court's determination on the competency of a child to testify is entitled to great weight on appeal because the trial court judge has the crucial advantage of seeing and hearing the child. State v. Troulliet, supra at 1270, citing State v. Foy, supra. The trial court judge is vested with wide discretion in determining the competency of the child witness and his ruling will not be disturbed on appeal, absent an abuse of discretion. Id.
*947 At the competency hearing, the victim, D.P., who was six years old at the time, was called to testify. Upon questioning by the trial court judge, D.P. stated that he attends church and believes in God, and he promised to tell the truth. He gave the name of the school he attends and stated that he had just finished kindergarten and was in the first grade. When questioned about what "subjects" he took in school, he did not understand. However, he answered correctly when he was provided with specific examples. When asked what it meant to tell a lie, D.P. responded that it was to "tell a different story." D.P. further stated that your mom and dad punish you when you tell a lie. He said that he was not afraid of God if he lied, but he was afraid of his mom and dad. The child admitted that he does get into trouble sometimes.
Under questioning by the State, D.P. was given hypothetical situations and asked to tell whether they constituted a lie. He did so correctly. He stated that he was to tell the truth when he was sitting in the witness chair. Under examination by defense counsel, the child stated that he would tell the truth. He said he had told lies in the "way past." He stated that there were eight days to a month. D.P. did not understand when asked the difference between what you know and what someone tells you, but when he was presented with specific examples, he was able to correctly discern the difference. Upon final questioning by the State, the victim responded that he would tell the truth.
The record reveals that the victim knew the difference between the truth and a lie. Moreover, when presented with concrete examples, the victim was also able to differentiate between what he knew and what he was told. Finally, although there was one incorrect response given by the child regarding the number of days in a month and two questions he did not understand, it is clear from the record that these questions were initially presented in a manner that could not be comprehended by a six-year-old child. This is illustrated by the fact that once the questions were presented in concrete terms, the child understood and responded correctly.
Considering the record before us, particularly the testimony of the child, we find that the trial judge did not abuse his discretion when he found the child victim competent to testify. Accordingly, the defendant's first assignment of error is without merit.
In his second assignment of error, defendant alleges that the trial judge erred in refusing to admit into evidence a copy of a competency hearing occurring ten months earlier, at which this victim had been found incompetent to testify. The defendant appears to argue that this prior finding supports his current position that the child was not competent to testify.
At the conclusion of the competency hearing in this case, the defendant attempted to offer the transcript of the St. Bernard competency hearing. After the State objected, the trial judge found the transcript of the St. Bernard hearing to be inadmissible. He stated that the child's competency at another time was not at issue and that he had the opportunity to test the competency of the witness at the time of this trial.
In denying the admissibility of this transcript, the trial judge apparently concluded that it was irrelevant and not probative of the child's current state of competency. Considering the fact that a competency hearing was held before the trial judge in this case and that the child's competency at the time of this trial was at issue, we cannot say that the trial judge erred in *948 excluding the transcript of the St. Bernard hearing. Accordingly, this assignment of error is without merit.
The defendant's third, fourth, and fifth assignments of error are related and will be addressed simultaneously. In his third assignment of error, the defendant contends that the trial court erred in granting the State's Motion in Limine to exclude any evidence concerning those allegations with respect to the prosecution of the defendant in the 34th Judicial District Court for the Parish of St. Bernard on August 14, 2000. In his fourth assignment of error, the defendant argues that the trial court erred in granting the State's Motion in Limine to exclude any reference to abuse allegations involving Anthony Miller. In his fifth assignment of error, the defendant asserts that the trial court erred in its ruling on the State's Motion in Limine to exclude any references to the hearing held on September 20, 1999 in the matter on the docket of the 34th Judicial District Court, bearing case number 224-027, wherein the alleged victim, D.P., could not answer the questions presented to him by the court to determine D.P.'s competency, thus depriving the defendant of his right to call witnesses to show that D.P. had likely been coached since his testimony at that hearing.
The defendant contends that the trial court's rulings on the Motions in Limine deprived him of a fair trial. He alleges that these rulings prevented him from presenting evidence and calling witnesses in his defense, as well as effectively cross-examining the State's witnesses. The State responds that the defendant had a fair trial at which he was actively represented and the trial court correctly granted the Motions in Limine, as the evidence the defendant sought to present was irrelevant. No witnesses were presented at the hearing on the Motions in Limine.
The Motion in Limine concerning the St. Bernard proceedings indicates that this defendant was charged with aggravated oral sexual battery and indecent behavior with a juvenile in May 1999. At least one alleged victim was D.P. The prosecution was voluntarily dismissed on October 26, 1999. In the motion, the State contends that the evidence is irrelevant to this prosecution and therefore inadmissible.
The Motion in Limine concerning Anthony Miller indicates that Miller, who is D.P.'s uncle[3], had been investigated for child abuse and the allegations were found to be false.
The trial court first took up arguments on the motion concerning the St. Bernard proceedings. The State argued the matter was not relevant to this proceeding. Defense counsel responded that he thought the evidence was relevant, in that his client sat in jail for seven months on charges that he abused D.P. and that the charges were voluntarily dismissed.
In granting the State's Motion in Limine on this issue, the trial court made the following ruling:
All right. The Court, not having been presented with any law one way or the other on this, neither in the State's Motion in Limine nor in the defense's position that this information should come in, the Court is going to rule that it is not admissible, the policing action of this District Attorney's office in another parish is not relevant to this prosecution, and I am going to so rule.
*949 The trial court then took up the State's second Motion in Limine concerning Anthony Miller. The State argued that the evidence concerning D.P.'s uncle, Anthony Miller, should be excluded as irrelevant to the facts of this case. The State pointed out to the court that the uncle was accused of the abuse of another child, a female victim, and the allegations against him were investigated by Child Services and found to be false. The defendant argued that the evidence was admissible because it would explain the family's motive in pursuing him and secreting the fact that a member of their family had been accused of child molestation.
In granting the State's Motion in Limine to exclude evidence regarding alleged sexual abuse by Anthony Miller against another victim, the trial court stated the following reasons:
I'm not going to let an investigation of a non-defendant, non-victim in this case, an investigation that went nowhere as far as the District Attorney's information, an investigation of an alleged abuse of a female, enter into these proceedings[.]
On appeal, the defendant does not contend that the basis of the trial court's ruling on the Motions in Limine were incorrect; rather he alleges that the results that flowed from those rulings have deprived him of the right to a fair trial. More particularly, the defendant contends that he was not able to let the jury hear two taped statements he made, one given to police in St. Bernard and the other a suicide tape[4], both of which allegedly contained exculpatory evidence. Specifically, the defendant alleges that by listening to the tapes, the jury would have been able to hear his denials of the abuse of this victim in his own words. Additionally, the police tape would have provided the jury with information that the victim allegedly told defendant that his "Paw Paw Tony" was the abuser, and this allegation would have been supported by the fact that Anthony Miller had been investigated for abuse of a young female. Finally, the defendant argues that the rulings prevented him from calling parties to the St. Bernard proceeding to show that D.P. had recently been found incompetent to testify.
In the present case, the defendant timely objected to the trial court ruling that the evidence was not relevant; however, on appeal, he asserts that he is being denied a fair trial, which is completely different from the grounds specified at trial. Since the defendant presents this ground for objection for the first time on appeal, the trial court was not afforded the opportunity to rule on it. State v. Richmond, 278 So.2d 17, 23 (La.1973). To preserve the right to seek appellate review of an alleged trial court error, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection. LSA-C.Cr.P. art. 841.
In State v. West, 419 So.2d 868, 876 (La.1982), the Louisiana Supreme Court discussed a similar situation:
Initially, it is noteworthy that defense counsel only objected to the complained of testimony at trial as being hearsay and irrelevant. There was no contemporaneous objection made on the grounds that the statements were highly inflammatory in nature. Thus, the provisions of La.C.Cr.P. art. 841, which require a *950 contemporaneous objection and the grounds therefore to preserve appellate review of a trial error were not satisfied. We have held that the grounds of counsel's objections must be sufficiently brought to the attention of the trial judge to allow him the opportunity to make the proper ruling and correct any claimed prejudice to the defendant. Therefore, a new ground for objection cannot be presented for the first time on appeal. It is settled that a new basis for an objection cannot be substituted on appeal and that only the grounds made known to the trial judge at the time of his ruling may be relied on by this court. Thus, this argument is untimely and not properly before us for review.
(Citations omitted).
Considering the caselaw on this issue, we will only address the defendant's argument to the extent that it challenges the basis for the trial court's ruling. Constitutional guarantees do not assure the defendant the right to the admissibility of any type of evidence, only that which is deemed trustworthy and has probative value. State v. Governor, 331 So.2d 443, 449 (La.1976). "Relevant evidence" is evidence that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than without the evidence. LSA-C.E. art. 401. The trial judge in deciding the issue of relevancy must determine whether the evidence bears a "rational" connection to the fact in issue in the case. State v. Williams, 341 So.2d 370, 374 (La.1976). Except as limited by the Code of Evidence and other laws, all relevant evidence is admissible and all irrelevant evidence is inadmissible. LSA-C.E. art. 402. Although relevant, evidence may nonetheless be excluded, if the probative value is substantially outweighed by its prejudicial effect. See: LSA-C.E. art. 403. A trial judge's determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. State v. Francis, 98-811 (La.App. 5 Cir. 1/26/99), 727 So.2d 1235, 1237, writ denied, 99-0671 (La.6/25/99), 746 So.2d 597.
In this case, the St. Bernard proceedings involved the same defendant and the same victim; however, the defendant failed to establish how those proceedings related to a material issue in this case. The evidence of the victim's prior accusations against this defendant could have been relevant and admissible to impeach the credibility of the victim if the defendant had established that the victim made prior false statements of sexual abuse. LSA-C.E. art. 607C; State v. Smith, 98-2045 (La.9/8/99), 743 So.2d 199, 203. However, no such showing was made in this case. The fact that the defendant was accused of sexual abuse and then the State entered a nolle prosequi to the charges, as argued by the defendant at the hearing on the Motion in Limine, does not establish that the accusations were false.
Moreover, the defendant has not shown that the St. Bernard proceedings were relevant to the issue of the victim's competency. As previously discussed in assignment of error number two, the best test of a person's competency is the person's current ability to understand. This is a determination for the judge, as a preliminary consideration, and not one for the jury. LSA-C.E. art. 104. The trial court ruled that the St. Bernard proceedings were irrelevant, and the defendant has failed to establish that the trial judge's decision to grant the State's Motion in Limine to exclude the evidence of those proceedings was incorrect.
The second Motion in Limine involved evidence that the victim's uncle, Anthony Miller, had been investigated for *951 the alleged sexual abuse of a minor female. Anthony Miller was not a defendant in this case, and there is no evidence in the record that he was even called as a witness. Moreover, his alleged victim is not the victim in this case.
At the motion hearing, the defendant alleged that the evidence of the prior investigation of Anthony Miller was relevant to the motive of the victim's family in having him prosecuted. He argued that the family was seeking to protect their relative, Mr. Miller, whom the defendant has asserted was D.P.'s abuser. Thus, the defendant argued that the Miller evidence was admissible to attack their credibility.
The defendant failed to establish a "rational connection" between the evidence that he sought to use and the issue of motive. There has been no proof that Anthony Miller abused D.P. and the victim specifically denied abuse by anyone but the defendant. Moreover, even if the victim in this case had accused Miller, the fact that Miller was falsely accused by someone else would bear no rational connection to the facts at issue in this case. Therefore, we find no error when the trial judge granted the State's Motion in Limine and excluded the Anthony Miller evidence.
For the reasons set forth above, we find that the defendant's third, fourth, and fifth assignments of error are without merit.
In his sixth and final assignment of error, the defendant asserts that the trial court erred in allowing the introduction of the videotape of the interview conducted by the forensic examiner at the Children's Advocacy Center on April 16, 1999. He contends that its prejudicial effect outweighed its probative value. He further asserts that the trial court erred when he ruled that the requirements of LSA-R.S. 15:440.1-5 had been met.
The defendant first complains that the State, in preparing the videotape, did not comply with the statutory safeguards for recording statements of juvenile sexual abuse victims. LSA-R.S.15:440.4 and 15:440.5. In particular, he alleges that the recording did not take place pursuant to a court order and the child was unduly influenced by the interviewer. The State counters that the interview was in accord with the statutory guidelines. The defendant also argues that the videotape was inadmissible because its prejudicial effect outweighed its probative value. The State replies the videotape was properly admitted into evidence by the trial court.
The defendant filed a Motion to Suppress Evidence in which he sought to have the videotaped interview of the victim suppressed. At the motion hearing, Officer McGregor testified regarding the procedures utilized in making the videotape. The trial court gave the following reasons for finding the videotape had been properly authenticated:
Well, I'm satisfied that, again, the preliminaries were taken care of properly; that the tape was handled in the proper manner and that the interview of the child took place in a proper manner....
So, I think what we're talking about really makes sense. I'll deny the motion to suppress as it relates to the preliminary matters in advance of the taking of the tape[.]
After the hearing at which the trial judge found the victim competent to testify, the judge viewed the videotape. In finding the videotape to be admissible into evidence, the trial court gave these additional reasons:
All right. Having reviewed the tape, the Court is of the opinion that its potential prejudicial effect is outweighed by its probative value.

*952 The Court finds that the child was not improperly influenced in his answers to questions and that I'm going to rule that the prosecution can use the tape, naturally with cross-examination of the witness by the defendant available[.]
The following events occurred when the videotape was offered into evidence by the State at trial:
MR. FREESE [D.A.]:
[J]udge, at this point I'll offer, file, introduce into evidence State's 1 through 3 which are the videotape and the drawings.
THE COURT:
Any objection?
MR. HARTLEY [DEFENSE]:
No objection to 1, 2 and 3.
THE COURT:
Let them be admitted into evidence.
(Emphasis added).
Generally, to preserve an issue for appeal, a party need not enter a contemporaneous objection to the court's ruling on a written motion. LSA-C.Cr.P. art. 841(B). However, where a defendant initially files a pre-trial motion objecting to the introduction of certain evidence, if at trial he specifically agrees to its introduction, he has waived his prior objection and loses the right to present the issue on appeal. State v. Butler, 30,798 (La.App. 2 Cir. 6/24/98), 714 So.2d 877, 894, writ denied, 98-2217 (La.1999), 734 So.2d 1222. See also State v. Dillon, 93-707 (La.App. 5 Cir. 1/24/94), 631 So.2d 1171, where the Court held that the defendant had waived any objection to the admissibility of crack pipes where a motion to suppress was filed but no hearing on the motion was conducted, and at trial the defendant specifically stated he had no objection to the physical evidence that he had previously sought to have suppressed.
Accordingly, in this case, the defendant first let his objection to the videotaped interview be known by his written motion, but he later stated that he had no objection to its introduction at trial. Therefore, he waived any right to raise issues concerning the authenticity or admissibility on appeal. Accordingly, this assignment of error is without merit.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). One patent error was noted.
At the time of sentencing the trial judge ordered both sentences to be served "without benefits or parole, probation or suspension of sentence." However, the commitment does not mention this restriction. In the event of a conflict between the commitment and the sentence, the transcript controls. State v. Lynch, 441 So.2d 732, 734 (La.1983). The absence of a statement in the commitment indicating that the sentence is to be served without benefits is a clerical error that does not prejudice defendant's rights. State v. Gilmore, 522 So.2d 658, 661 (La.App. 5 Cir.1988). Therefore, we remand to the trial court to amend the commitment to specify this restriction.
For the reasons set forth above, we affirm the defendant's conviction and sentence, and we remand to the trial court to amend the commitment to conform with the transcript.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] In order to protect his identity, the victim will be referred to as "D.P.", in accordance with LSA-46:1844.
[2] Only the first name of the victim's mother is used to protect the child's identity.
[3] The transcript indicates that Anthony Miller is Gary Miller's brother. (R., pp. 171, 481, 658).
[4] It is noted that, during the trial, the court ruled that the defendant could testify as to the statements he made on the audiotape. The defendant, however, withdrew that line of questioning when the State cautioned that the questions would "open the door" to evidence which was prejudicial to the defendant.