*837
 
 JUDE G. GRAVOIS, Judge.
 

 |2Pefendant, Michele Ramirez, appeals her conviction of manslaughter, a violation of LSA-R.S. 14:31. For the reasons that follow, we affirm.
 

 PROCEDURAL HISTORY AND FACTS
 

 A Jefferson Parish Grand Jury indicted defendant, Michele Ramirez, for second degree murder of Edwina Ulfers in violation of LSA-R.S. 14:30.1. She pled not guilty and filed several pre-trial motions, including motions to suppress the evidence and statement, which were denied after hearings.
 
 [1]
 
 She proceeded to trial on November 10, 2008. After a four-day trial, a 12-person jury found defendant guilty of the lesser charge of manslaughter. The trial court sentenced defendant to 40 years at hard labor. She timely appealed her conviction.
 

 On appeal, defendant raises the following assignments of error:
 

 |;il. The trial court erred in denying the defense’s right to present a defense regarding a statement made by the victim to a trial witness right before the actual attack happened.
 

 2. The trial court erred in allowing hearsay evidence under the guise of a “dying declaration” made by the victim.
 

 3. The trial court erred in failing to grant a mistrial when the defense only learned at trial during the state’s direct exam that a witness had been a paid informant of the JPSO for years and thus was an agent of the state.
 

 4. The trial court erred in allowing an excessive number of gruesome photos of the victim into evidence that were merely cumulative and prejudicial to the defense in that they were used solely to pander to the jury’s sympathy.
 

 5.The evidence was insufficient to support the verdict of manslaughter since identity was not proven beyond a reasonable doubt.
 

 On August 30, 2006, Officer Peter Caza-lot with the Jefferson Parish Sheriffs Office responded to an emergency call involving an aggravated burglary at 417 Shrewsbury Court in Jefferson Parish. He immediately responded to the scene, which was two blocks from his location. When he arrived, he saw a man, Joseph Ulfers, sitting on the porch, and an elderly female, Edwina Ulfers, lying on the living room floor. Mrs. Ulfers, age 94, was covered in blood and was bleeding from the back of her head. Her face and eyes were swollen.
 

 Officer Cazalot secured the house and called for an ambulance because of Mrs. Ulfers’ injuries. He noted the house was ransacked. Officer Cazalot helped Mrs. Ulfers sit up. She told him she was beaten with a telephone by a female wearing black pants and a sleeveless shirt. Officer Cazalot immediately put the description of the perpetrator out over his police radio so that police units en route to the scene could canvas the area and look for the perpetrator. He called a second time for an ambulance as he noticed Mrs. Ulfers’ condition deteriorating.
 

 Mrs. Ulfers was ultimately transported to Ochsner Hospital. That night at the hospital, Mrs. Ulfers told Deputy Anthony Bennett that she was sitting in her bedroom chair when a white female entered the room, grabbed her by the throat, |4and demanded money. Mrs. Ulfers said she stood up out of her chair at which time the
 
 *838
 
 female grabbed the telephone off of her dresser and repeatedly hit her in the head with it, causing her to fall to the floor. Mrs. Ulfers saw the female grab another object, which Mrs. Ulfers could not identify and which the female used to hit her again. Mrs. Ulfers told Deputy Bennett that she then crawled from the bedroom to the living room.
 

 Joseph Ulfers, the victim’s son, stated that prior to the incident, a woman whom he later identified as defendant came to the back door of his residence looking for a friend and asked to use the bathroom. Defendant was allowed to enter the home, but was not allowed to use the bathroom. Defendant then asked for a drink of water, which Mr. Ulfers gave her. After defendant left at his request, Mr. Ulfers checked on his elderly mother, who was sleeping in her bedroom, and then got a beer and sat out on his front porch. He next heard his mother yelling for him and found her on the living room floor bleeding profusely from her head.
 

 According to Mr. Ulfers, his mother told him that the woman they gave water to had come back and hit her. Mr. Ulfers called 911 from his cell phone because he could not find the phone in his mother’s bedroom. He stated everything in his mother’s room was a mess. Mr. Ulfers noted that $20 cash and a checkbook were taken from the house.
 

 Meanwhile, later that evening, defendant had been detained in the 900 block of Shrewsbury Road after fitting the description of the perpetrator who had earlier been described by Deputy Cazalot over his police radio. The police then took Mr. Ulfers there to see if he could identify the person detained. Defendant had what looked like dried blood on her right foot and scratches on her right palm and on the back of her legs. Mr. Ulfers, who was in a patrol car, was driven past defendant and positively identified defendant while she stood in front of a patrol car as the | .¡person who had earlier been to his residence. Mr. Ulfers noted that defendant was wearing the same shirt she had been wearing when she was at his house, but she was wearing different pants.
 

 Defendant was advised of her rights and evidence was collected from her person. The blood on her foot was found to be consistent with the victim’s DNA. Defendant waived her rights and gave a few statements to the police. At the location of her arrest, defendant denied being at the victim’s house on Shrewsbury Court. In a later statement made at the detective bureau, however, defendant admitted to going to the victim’s house. She stated that she met Mr. Ulfers at a gas station and went back to his house “to turn a trick” with him. She then said that she simply drank a beer with him. The next day, defendant gave another statement, which was taped, to the police. In this taped statement, defendant stated that she and a girl named Sunny met Mr. Ulfers at a Spur station, and that Sunny was “going to trick the guy” at his house. Defendant explained that Mr. Ulfers left them in a back area outside the house, after which she and Sunny went inside the house to find money. Defendant stated that she then saw Sunny start beating the victim so she ran out of the house.
 

 Sunny Williams testified at trial and denied ever going to the victim’s house. Sunny stated she had not seen defendant since the two were arrested together in June 2006 for possession of cocaine and drug paraphernalia. Sunny’s DNA was not found on anything at the victim’s house.
 

 Defendant’s jail cellmate, Christine Newman, testified that defendant told her about the incident while they were in jail together. According to Newman, defendant told her she was going to the victim’s
 
 *839
 
 house to “turn a trick.” Defendant also told her she beat a lady, who was lying in chair, with a phone. Another inmate, Trudy Hotard, also testified that defendant told her she hit the victim with |,;a phone. Both Newman and Hotard stated that defendant did not mention the involvement of a second person until she talked to them a second time.
 

 Mrs. Ulfers died from her injuries approximately thirty days after the attack on her. According to Dr. Susan Garcia, a forensic pathologist who performed Mrs. Ulfers’ autopsy, Mrs. Ulfers’ death was caused by blunt force trauma to her face and chest that resulted in facial fractures and broken ribs.
 

 At trial, defendant testified that she and Sunny met for a prostitution date on the date of the incident. She stated Sunny set up the date with Mr. Ulfers and the two went to Mr. Ulfers’ house where he offered them beer. Defendant said she overheard Mr. Ulfers say he did not have enough money. She then saw Sunny follow Mr. Ulfers into the house. Defendant finished her beer and then went inside to the kitchen where she heard commotion and saw Sunny in the victim’s bedroom hitting the victim. According to defendant, Sunny told her to take the checkbook and buy cigarettes and alcohol. Defendant did so and then went back to the Inn Motel where she changed clothes. Defendant denied striking the victim and claimed it was Sunny who hit the victim. She stated that the scratches on her legs and hand came from jumping a fence. She further explained she got the victim’s blood on her foot when she went into the victim’s room to get the checkbook from Sunny.
 

 Mr. Ulfers denied soliciting defendant or Sunny Williams for prostitution and denied ever having seen Williams.
 

 ASSIGNMENT OF ERROR NUMBER
 
 FIVE
 
 [2]
 

 Defendant argues the evidence was insufficient to support her conviction for manslaughter since identity was not proven beyond a reasonable doubt. Defendant 17points out that the perpetrator was described as wearing black pants or shorts and that she was wearing camouflage sweat pants when she was picked up a few hours after the incident. She contends that no bloody pants were found in her home, which demonstrates that she did not change clothes between the time of the incident and the time she was stopped. Defendant contends that the evidence supports her reasonable hypothesis that Sunny Williams was the perpetrator.
 

 The State responds that the evidence sufficiently proved that defendant was the perpetrator and offered the following evidence in support of its contention: both the -victim and Mr. Ulfers described the perpetrator as a white female wearing a black sleeveless top and black long pants; long pants were found in defendant’s motel room hidden behind a dresser; defendant had the victim’s blood on her foot and had lacerations on her hand; Mr. Ulfers positively identified defendant as the person who came to the house prior to the beating asking for water; and, defendant confessed to other inmates while awaiting trial that she beat the victim.
 

 The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could con-
 
 *840
 
 elude that the State proved the essential elements of the crime beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In addition to proving the statutory elements of the charged offense at trial, the State is required to prove defendant’s identity as the perpetrator.
 
 State v. Ingram,
 
 04-551, p. 6 (La.App. 5 Cir. 10/26/04), 888 So.2d 923, 926. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof.
 
 Id.
 

 Defendant does not argue that the State failed to establish any of the essential statutory elements of her conviction but only contends that the State [ ^failed to prove beyond a reasonable doubt her identity as the offender. Therefore, the sufficiency of the evidence with respect to the statutory elements of second degree murder is not addressed.
 
 See State v. King,
 
 05-553, pp. 7-10 (La.App. 5 Cir. 1/31/06), 922 So.2d 1207, 1211-13,
 
 writ denied,
 
 06-1084 (La.11/9/06), 941 So.2d 36.
 

 The only witness to the actual beating resulting in the victim’s death was the victim herself, who died without making a direct identification of defendant as her assailant. Immediately after the beating, the victim told her son that the woman to whom they had previously given water to came back and hit her. Mr. Ulfers explained that a woman had come to their door prior to the incident looking for a friend and asking for a drink of water. Mr. Ulfers gave the woman water in a red plastic cup. The evidence showed DNA on the red plastic cup left on the table outside the back door of the Ulfers’ house was consistent with defendant’s DNA. The DNA analyst testified that Sunny Williams, whom defendant claims was the perpetrator, was excluded as the donor of all DNA tested at the scene.
 

 The victim also gave a description of the perpetrator to Deputy Cazalot at the scene shortly after the beating. She stated that the perpetrator was a white female, 40-45 years old, wearing black pants and a sleeveless shirt. The victim also gave a description of the perpetrator to Deputy Bennett at the hospital. She described the perpetrator as a white female, dark hair, five feet three inches to five feet six inches tall, weighing between 130 and 140 pounds, wearing dark colored pants and a sleeveless tank top type shirt.
 

 Defendant, who fit the description of the perpetrator, was stopped by Sgt. Richard Dykes approximately three hours after the incident several blocks from the victim’s home wearing dark colored shorts and a sleeveless shirt. Mr. Ulfers identified defendant at the location where she was stopped as the same person who |9had been at his house that afternoon. He explained that she was wearing the same shirt but was no longer wearing long pants. At the time defendant was stopped, she had cuts on her hands and blood was found on her right foot. Later analysis revealed the blood on her foot was that of the victim.
 

 Sgt. Dykes, who stopped defendant, testified that he detained defendant as she was walking near the Inn Motel where she was staying. A search of her motel room revealed black pants stuffed behind a dresser. Photos introduced into evidence show that the black pants were actually only the leg portion of the pants, which appeared to have been cut off. The photos of defendant at the time of her arrest show her wearing black shorts rolled at the hem that seemingly match the cut pants legs found behind the dresser in her motel room.
 

 On appeal, defendant argues she was wearing camouflage pants when stopped. The record, however, clearly shows that at
 
 *841
 
 the time defendant was stopped, she was wearing black shorts that appeared to match the leg portions found in defendant’s motel room. There is evidence in the record that defendant was wearing camouflage pants at some point on the day of the incident. Sgt. Dykes testified he had seen defendant earlier in the day before the incident wearing a sleeveless shirt with a logo on the front and camouflage sweat pants, and surveillance photographs from the nearby Spur gas station showed defendant in camouflage pants on the day of the incident. Of note, camouflage pants were also found behind the dresser in defendant’s motel room. Additionally, human blood was found around the bottom of the camouflage pants.
 
 [3]
 

 At trial, defendant admitted that she was at the victim’s house. She testified that she went there with Sunny Williams for a “prostitution date.” Defendant [ instated that Mr. Ulfers gave them some beer. She then heard Mr. Ulfers and Sunny talking about Mr. Ulfers not having enough money. Defendant stated Mr. Ul-fers went inside and Sunny followed him. She testified that she finished her beer and then went inside at which time she saw Sunny hitting the victim. According to defendant, Sunny told her to take the victim’s checkbook and to go buy cigarettes and alcohol. Defendant testified that she went to a gas station after leaving the house and then went back to the motel.
 

 Defendant testified that on the date in question, she wore a black summer shirt and camouflage pants, and that Sunny was wearing a black summer shirt and long black pants. Defendant denied ever hitting the victim and explained she got blood on her when she went in the victim’s room to get the checkbook from Sunny.
 

 Sunny Williams testified that she had never been to the victim’s house and did not beat the victim. She admitted that she was a drug addict and a prostitute. She stated that she had not seen defendant since the two of them had been arrested over one month before the incident for drug offenses. She explained that she had been picked up in December 2006 and questioned about the incident. Sunny gave a statement to the police at that time denying any involvement.
 

 When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness.
 
 State v. Bailey,
 
 04-85, p. 4 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955,
 
 writ denied,
 
 04-1605 (La.11/15/04), 887 So.2d 476, cert
 
 denied,
 
 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). It is not the function of the appellate court to assess the credibility of witnesses or to reweigh the evidence.
 
 Id.
 

 | nThe jury rejected defendant’s self-serving testimony and was not unreasonable in doing so. Sunny Williams denied being at the scene of the crime and none of her DNA was found on any evidence processed at the scene. Conversely, DNA found on a red plastic cup and two beer cans at the scene was consistent with defendant’s DNA. Additionally, the victim’s blood was found the top on defendant’s foot. Captain Scanlon of the Jefferson Parish Crime Laboratory testified that this finding was significant because the blood’s location on the top of her foot put defendant “in the action,” rather than a bystander who may have merely stepped in the blood. Furthermore, according to
 
 *842
 
 two witnesses, Christine Newman and Trudy Hotard, defendant admitted to them that she beat the victim. Also, Mr. Ulfers positively identified defendant as the person to whom he had given water. Furthermore, the victim stated that the person to whom they had given water was the person who beat her.
 

 Viewing the evidence in a light most favorable to the State, we find that the evidence sufficiently negates all reasonable probability of misidentification. The State sufficiently proved defendant’s identity as the perpetrator of the offense. This assignment of error is accordingly without merit.
 

 ASSIGNMENT OF ERROR NUMBER ONE
 

 Defendant argues that the trial court denied her the right to present a defense by limiting her cross-examination of Mr. Ulfers. She claims that she was erroneously prevented from questioning Mr. Ul-fers about a statement the victim made to him just
 
 before
 
 the incident wherein the victim stated that she had been attacked with a knife. Defendant claims the trial court’s ruling that this statement was inadmissible prevented her from giving the jury a complete picture of the day’s events and how Mr. Ulfers came to believe it was defendant who attacked his | ^mother when he did not see the attack. She maintains the statement was highly relevant and necessary because had the jury heard the statement and the fact Mr. Ulfers discounted it, the jury may have given more credence to defendant’s version of what happened. Defendant claims that the statement directly challenges the only element in the case in question but does not clearly explain how. Defendant further contends the victim’s earlier statement should have been admissible as
 
 res gestae.
 

 The State first argues that defendant is precluded from raising this issue on appeal because she failed to contemporaneously object to the trial court’s ruling that the statement was inadmissible. This contention is unfounded, however. The record shows that defendant contemporaneously objected to the trial court’s ruling that the victim’s earlier statement was inadmissible through Mr. Ulfers’ testimony and thus properly preserved this issue for appeal.
 
 [4]
 

 The State next contends that the trial court properly prohibited defendant from questioning Mr. Ulfers about the statement the victim made before the incident because the statement constituted hearsay and was not admissible under any exception to the hearsay rule.
 

 On appeal, defendant argues that the victim’s earlier statement should have been admissible under the rationale stated in
 
 State v. Gremillion,
 
 542 So.2d 1074 (La.1989). In
 
 Gremillion,
 
 the Supreme Court overturned the trial court and ruled that the victim’s hearsay statement regarding the identity of his attackers should have been admitted, even though it did not fit any hearsay exceptions, because under the circumstances it was inherently reliable and trustworthy. The Supreme Court noted that the statement was corroborated by another statement the victim |,smade to the admitting physician that he was attacked by “several others,” which had been admitted into evidence.
 
 Id.,
 
 at 1078. The defendant had argued that the exclusion of
 
 *843
 
 the statement impaired his due process right to present a defense.
 

 In the present case, the trial court ruled that the victim’s earlier statement was inadmissible hearsay. Hearsay is an out-of-court statement, other than one made by the declarant while testifying at the present trial, offered to prove the truth of the matter asserted and is generally inadmissible unless it fits into one of the recognized exceptions. LSA-C.E. arts. 801(C) and 802.
 

 We find, however, that the statement at issue did not constitute hearsay because it was not offered to prove that the incident with the knife actually happened. Rather, defendant specifically sought to introduce the statement to challenge the victim’s credibility and to suggest that the victim was senile or suffered from dementia because her own son did not believe her at the time she made the earlier statement. Thus, the trial court erred in ruling the statement inadmissible as hearsay because the statement was not offered to prove the truth of the matter asserted. Because
 
 Gremillion
 
 pertains to the admissibility of hearsay,
 
 Gremillion
 
 is inapplicable to the present case.
 

 This statement, however, was not relevant evidence to attack the victim’s credibility or to prove that she was senile. Relevant evidence is any “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” LSA-C.E. art. 401. All relevant evidence is admissible, except as otherwise provided by law. LSA-C.E. art. 402. But, even relevant evidence may be excluded “if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” LSA-C.E. art. 408.
 

 |14A criminal defendant has the constitutional right to present a defense. However, the right to present a defense does not require the trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice.
 
 State v. Marsalis,
 
 04-827, p. 12 (La.App. 5 Cir. 4/26/05), 902 So.2d 1081, 1088. A conviction will not be overturned where the defendant does not show that he was prejudiced by a limitation of the cross-examination of a witness.
 
 State v. Hall,
 
 02-1701, p. 4 (La.App. 4 Cir. 6/25/03), 851 So.2d 830, 333,
 
 writ denied,
 
 03-2305 (La.2/6/04), 865 So.2d 738.
 

 In the present case, defendant contends that the victim’s statement about being threatened with a knife was relevant to show that the victim was senile and, thus, her later description of the perpetrator, upon which Mr. Ulfers based his identification of defendant, was less credible. The fact Mr. Ulfers may not have believed his mother’s statement about being threatened with a knife prior to the beating does not make it more probable that the victim was senile, however. Additionally, the mere fact Mr. Ulfers did not believe his mother’s earlier statement does not make it more probable that the statement was false thereby rendering her statements after the attack less credible. The fact Mr. Ulfers discounted his mother’s earlier statement about being threatened with a knife does not make it more probable that he should not have believed her later statement describing her assailant while she lay bleeding on the floor. Because the statement in question was not relevant to attack the victim’s credibility or faculties, the trial court’s ruling excluding the victim’s earlier statement from evidence did not deny defendant her right to present a defense.
 

 
 *844
 
 Defendant also argues the victim’s earlier statement was admissible as
 
 res gestae. Res gestae,
 
 now known as integral act evidence, is a traditional “state of | lsmind” hearsay exception.
 
 State v. Parks,
 
 08-423, p. 11 (La.App. 5 Cir. 11/25/08), 2 So.3d 470, 476,
 
 writ denied,
 
 09-142 (La.10/2/09), 18 So.3d 101. As previously discussed, the victims statement regarding the knife threat was not hearsay because it was not offered for the truth of the matter asserted. As such, the doctrine of
 
 res gestae
 
 is not applicable.
 

 For the reasons stated above, we find no merit to this assignment of error.
 

 ASSIGNMENT OF ERROR NUMBER TWO
 

 Defendant argues that the trial court erred in allowing into evidence three separate statements made by the victim prior to her death under the dying declaration and excited utterance exceptions to the hearsay rule. She contends that none of the three statements were made by the victim while she believed she might die. She further maintains that none of the statements constituted spontaneous outbursts or were made while the victim was still under the influence of a startling event. As such, defendant asserts that all three statements should have been excluded from evidence as inadmissible hearsay.
 

 A trial judge’s determination of the admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion.
 
 State v. Odoms,
 
 01-1033, p. 10 (La.App. 5 Cir. 3/26/02), 815 So.2d 224, 230-31,
 
 writ denied,
 
 02-1185 (La.11/22/02), 829 So.2d 1037.
 

 As noted previously, hearsay is an out-of-court statement, other than one made by the declarant while testifying at the present trial, offered to prove the truth of the matter asserted. LSA-C.E. art. 801(C). Hearsay evidence is generally inadmissible unless otherwise provided by the Code of Evidence or other legislation. LSA-C.E. art. 802. Exceptions to the hearsay rule include excited utterances and dying declarations. LSA-C.E. art. 803(2) and 804(B)(2).
 

 6 An excited utterance is defined as “[a] statement relating to a startling event or condition made while the declar-ant was under the stress of excitement caused by the event or condition.” LSA-C.E. art. 803(2). There are two requirements for the excited utterance exception to the hearsay rule to apply: (1) there must have been an event sufficiently startling to render a declarant’s normal reflective thought process inoperative, and (2) the statement must have been a spontaneous reaction to the event and not the result of reflective thought.
 
 State v. Henderson,
 
 362 So.2d 1358, 1362 (La.1978);
 
 State v. Hester,
 
 99-426, p. 14 (La.App. 5 Cir. 9/28/99), 746 So.2d 95,106.
 

 The most important factor in determining whether a statement was made under the stress of a startling event is time. Other factors include whether the statement is self-serving or in response to an inquiry, whether the statement expands beyond a description of events to include past or future facts, and whether the de-clarant performed tasks requiring reflective thought between the event and the statement.
 
 Id.,
 
 at 14-15, 746 So.2d at 106. The trial court must determine “whether the interval between the event and the statement was long enough to permit a subsidence of emotional upset and a restoration of a reflective thought process.”
 
 State v. Hilton,
 
 99-1239, p. 11 (La.App. 1 Cir. 3/31/00), 764 So.2d 1027, 1035,
 
 writ denied,
 
 00-958 (La.3/9/01), 786 So.2d 113.
 

 A dying declaration is defined as “[a] statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending
 
 *845
 
 death.” LSA-C.E. art 804(B)(2). A statement is admissible as a dying declaration if it is made when the declarant is conscious of his condition and aware of his approaching demise.
 
 State v. Verrett,
 
 419 So.2d 455, 457 (La.1982).
 

 | nThe victim need not express his awareness of his demise in direct terms, but rather the necessary state of mind may be inferred from the facts and circumstances surrounding the making of the declaration.
 
 Id.; State v. Bell,
 
 97-896, p. 2 (La.App. 5 Cir. 10/14/98), 721 So.2d 38, 40,
 
 writs denied,
 
 98-2875 and 98-2890 (La.3/12/99), 738 So.2d 1085. The Louisiana Supreme Court has explained that:
 

 [N]o absolute rule can be laid down by which to decide with certainty -whether the declarant, at the time of making his statement, really expected to die, yet when the wound is from its nature mortal, and when, as a matter of fact, the deceased shortly after making his statement died, the courts have uniformly held that the declarant really believed that death was impending, and his statement has been admitted as a dying declaration.
 

 State v. Verrett, supra
 
 at 456,
 
 quoting State v. Augustus,
 
 129 La. 617, 56 So. 551 (1911). The Supreme Court further explained that “the more serious the injury and impairment of the declarant’s physical condition, the more probable is his belief that the end is near.”
 
 State v. Verrett, supra,
 
 at 457.
 

 Victim’s statement to her son at the scene
 

 At the hearing on the motion to admit the victim’s statement into evidence, Mr. Ulfers testified that he heard his 94-year-old mother call for him while he was sitting on the front porch. He opened the door to the house and saw his mother leaning across the sofa bleeding profusely from her head. He stated that the side of her face was black and blue and her eye was swollen shut. Mr. Ulfers testified that his mother told him “a woman came back and beat the hell out of me.” Mr. Ulfers explained he understood the woman to whom his mother was referring to be the woman who had come to the house earlier in the day and knocked on the door. Mr. Ulfers immediately called 911. At trial, Mr. Ulfers stated that after finding his | ^mother bleeding on the living room floor, he asked her what happened and she replied that the woman they gave water to came back and hit her.
 
 [5]
 

 On appeal, defendant argues that the victim’s statement to her son did not constitute an excited utterance or a dying declaration and should not have been admitted into evidence. She claims that by the time the victim made the statement, she was not startled and her statement was not a spontaneous outburst. She maintains the statement was not immediate to the event. She further contends it was not a dying declaration because there was no indication the victim thought she was dying.
 

 
 *846
 
 In
 
 State v. Moye,
 
 99-2413, pp. 6-7 (La.App. 4 Cir. 6/14/00), 765 So.2d 1103, 1107, the Fourth Circuit determined the victim’s identification of the defendant as the shooter when the police entered the house and found him lying on the floor bleeding from his wound was admissible under the excited utterance exception to the hearsay rule. The court noted that the victim “was still under the stress of excitement caused by his being shot when he identified the defendant as the one who shot him.”
 
 Id.,
 
 at 7, 765 So.2d at 1107.
 

 In the present case, the victim’s statement to her son was made shortly after she was beaten and before 911 was called. The record indicates the victim crawled from her bedroom to the living room after she was beaten. She called for her son, who immediately responded. It does not appear that much time passed between the beating and the victim’s statement. The statement was made before the police and emergency medical services arrived. The trial court did not err in finding the victim’s statement to her son to be an excited utterance. The 94-year-old victim h9was severely beaten and was obviously suffering from the trauma of the attack at the time she was found by her son and made the statement in question.
 
 [6]
 

 Victim’s statement to Deputy Cazalot at the scene
 

 Defendant also challenges the admissibility of the victim’s statement to the first responding officer, Deputy Cazalot, at the scene. She makes the same arguments for inadmissibility as she did regarding the victim’s statement to her son. Defendant contends that the victim’s statement to Deputy Cazalot was neither an excited utterance nor a dying declaration because the statement was not immediate to the event and was not a startled or spontaneous outburst and the victim never indicated she thought she was dying.
 

 At the pre-trial hearing, Deputy Cazalot testified he arrived at the scene within ten minutes of the 911 call. When he arrived, he saw the elderly victim lying on the floor bleeding from her head. He noted that the left side of her face was swollen and she had blood on her clothes. He checked the house for possible perpetrators, called for an ambulance, and then returned to the victim to question her. The victim then stated to Deputy Cazalot that she was beaten with a phone by a white female with black pants and a sleeveless black shirt. As Deputy Cazalot tried to get more information from the victim, she complained of chest pains and shortness of breath. He called for an ambulance a second time because of the victim’s deteriorating condition. At trial, Deputy Caza-lot explained that he had been an emergency medical technician for 17 years. He stated the victim was in distress and in his opinion her condition was critical.
 

 Similar to the victim’s statement to her son, not much time passed between the beating and her statement to Deputy Ca-zalot. Mr. Ulfers called 911 |2()immediately after his mother called to him and after finding her lying on the floor and Deputy Cazalot arrived at the scene within ten minutes. The victim gave a description of the perpetrator to Deputy Cazalot within one minute of his arrival and before emergency medical services arrived. These facts are similar to
 
 State v. Moye,
 
 99-2413 at 2, 765 So.2d at 1104, discussed above, where the Fourth Circuit upheld the admissibility of the victim’s statement identifying his shooter to the detective, as the detective entered the house and while the victim lay on floor bleeding, as an excited
 
 *847
 
 utterance. See also
 
 State v. Henderson,
 
 362 So.2d 1358 (La.1978), where the Supreme Court concluded that the trial court did not err in finding statements admissible as excited utterances considering the victim’s condition and the short time (ten minutes) between the shooting and the statement.
 

 Furthermore, as previously stated, another factor in determining whether a statement was made under the stress of a startling event is whether the declarant performed tasks requiring reflective thought between the event and the statement.
 
 State v. Hester,
 
 99-426 at 15, 746 So.2d at 106. When Deputy Cazalot arrived on the scene, the victim was still lying on the floor bleeding from her head. Although the victim was conscious and able to answer questions, her condition was considered critical given her age of 94 and the amount of head trauma she had sustained. The victim herself indicated her pain was a ten on a scale of one to ten with ten being the worst. There is nothing in the record to suggest that the victim performed or was capable of performing any tasks requiring reflective thought pri- or to giving the statement.
 

 We accordingly conclude that the trial court did not err in ruling the victim’s statement to Deputy Cazalot admissible as an excited utterance.
 
 [7]
 

 ^Victim’s statement to Deputy Bennett at the hospital
 

 Defendant further challenges the admissibility of the victim’s statement to Deputy Bennett at the hospital as a dying declaration. She again maintains that the victim never indicated that she thought she was dying from her injuries. Defendant asserts that the victim’s statement to Deputy Bennett was made after she was stable at the hospital hours after the incident. She contends that the victim lived for over three weeks after the beating and underwent two surgeries, which defendant asserts showed she had hopes of recovery.
 

 At the hearing on the admissibility of the victim’s statement, Deputy Bennett testified that he went to the hospital approximately two hours and forty-five minutes after the victim was taken there by ambulance. When he arrived at the hospital, Deputy Bennett observed the victim talking to family members about what she wanted done with her house and the fact she wanted to make sure her son kept the house. According to Deputy Bennett, the victim waived him over and told him that she needed to tell him what happened. She proceeded to describe the attack.
 

 When Deputy Bennett asked the victim if she could give a description of her assailant, the victim described her assailant as a white female between 35 and 40 years old, brown hair, between five feet three inches and five feet six inches tall, 135 pounds, and wearing a black sleeveless tank top and black jeans. Deputy Bennett stated the victim then became incoherent and could no longer talk.
 

 As previously stated, the victim does not have to express in direct terms his awareness of his condition, or his approaching demise.
 
 State v. Verrett,
 
 419 So.2d at 457. The victim’s necessary state of mind can be inferred from the facts and circumstances surrounding the declaration.
 
 Id.
 

 |22In
 
 State v. Bell,
 
 97-896, pp. 2-3 (La.App. 5 Cir. 10/14/98), 721 So.2d 38, 40,
 
 writs denied,
 
 98-2875 and 98-2890 (La.3/12/99), 738 So.2d 1085, this Court found the victim’s statement to be a dying declaration. According to the paramedic, the victim had low blood pressure, a low
 
 *848
 
 heart rate, and was deteriorating towards death. The officer testified that the victim could have gathered from the quickness of his and his partner’s actions and their conversations the seriousness of his condition. From these circumstances, this Court found the victim was aware of his approaching death.
 
 Id.
 
 See also
 
 State v. Calender,
 
 06-291, pp. 3-4 (La.App. 4 Cir. 9/20/06), 941 So.2d 624, 626,
 
 writ denied,
 
 06-2520 (La.12/15/06), 945 So.2d 694.
 

 Furthermore, the fact the victim survived approximately 30 days after the beating does not automatically render the statement inadmissible as a dying declaration. In
 
 State v. Nicholson,
 
 96-2110, pp. 6-8 (La.App. 4 Cir. 11/26/97), 703 So.2d 173, 176-77,
 
 writ denied,
 
 98-14 (La.5/1/98), 805 So.2d 200, the Fourth Circuit upheld the introduction of the victim’s statements made to his mother and an investigating officer during his hospital stay as dying declarations even though the victim lingered for 16 days before dying.
 

 In the present case, although the victim, Mrs. Ulfers, never expressly stated that she thought she would die from her injuries, the circumstances under which the statement was made allow for a reasonable inference that she believed she was dying. Deputy Bennett stated that when he arrived at the hospital, Mrs. Ulfers was talking to family members about her affairs. Additionally, Mrs. Ulfers was 94 years old and sustained a severe beating. She was brought to the hospital on a heart monitor and with an oxygen mask and her heart beat was irregular. Deputy Cazalot testified Mrs. Ulfers’ condition was critical and that he did not know if she would make it. Furthermore, at trial, Mr. Ulfers testified that after he called 911, l^his mother was on her knees praying and mumbling until police arrived, which suggests she was aware of her condition.
 

 Based on the above, we find that the trial court did not err in ruling that the victim’s statement to Deputy Bennett at the hospital was admissible as a dying declaration. The victim’s elderly age of 94, the magnitude of .her injuries, and the circumstances surrounding her statement adequately establish an inferential basis for finding that the victim believed she might die from her injuries.
 

 For these reasons, defendant’s assignment that the trial court erred in allowing these three separate statements made by the victim prior to her death under the dying declaration and excited utterance exceptions to the hearsay rule is without merit.
 

 ASSIGNMENT OF ERROR NUMBER THREE
 

 Defendant argues that the trial court erred in denying her motion for a mistrial after she learned at trial that a State’s witness, Trudy Hotard, had been a paid informant. She maintains that Ho-tard was an agent of the State and therefore was required to identify herself as such when defendant talked to her in jail. Defendant contends that the State cannot use a paid informant to circumvent her right to counsel and obtain a confession under the guise that the informant is a “random jailhouse snitch.”
 

 Defendant acknowledges that a pre-trial hearing was held to determine whether Hotard was an agent of the State at the time defendant confided in her, but contends the fact Hotard was a previously paid informant was not disclosed to her.
 
 [8]
 
 
 *849
 
 Defendant seems to suggest that the additional information that Hotard was a paid ^informant in the past made her more likely to be an agent of the State. Defendant asserts that a mistrial, or an admonishment at minimum, was required under LSA-C.Cr.P. art. 770 because of the prejudicial conduct of the State in failing to disclose Hotard was a previously paid informant.
 

 The State responds that the trial court ruled prior to trial that Hotard was not an agent of the State despite being an informant on a prior narcotics case and therefore defendant’s right to counsel was not violated. Since Hotard was not an agent of the State, the State asserts that defendant fails to show how she was prejudiced by the information. Additionally, the State points out that defendant fails to state what the nature of the admonishment should be.
 

 At trial, Hotard testified that the defendant came to her while they were in the Jefferson Parish Correctional Center together and that told Hotard she had a murder charge. According to Hotard, defendant told her that she went to the house to turn a trick and that the victim caught her when she trying to steal money and a checkbook after she went into the house. The defendant then stated to Ho-tard that she grabbed a phone and hit the victim with it.
 

 On direct examination, Hotard admitted she had given information to the police before in the past and had been paid. She testified, however, that she did not receive and did not ask for money in the present case. On cross-examination, Hotard stated it had been years since she had been a paid informant, estimating it was in the 1990s and in 2001.
 
 [9]
 

 On appeal, defendant argues a mistrial should have been granted under LSA-C.Cr.P. art. 775 because the prejudicial conduct by the State affected her right to a fair trial. Under LSA-C.Cr.P. art. 775, a mistrial shall be ordered “when ^prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial.”
 

 A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial.
 
 State v. Lagarde,
 
 07-123, pp. 10-11 (La.App. 5 Cir. 5/29/07), 960 So.2d 1105, 1113-14,
 
 writ denied,
 
 07-1650 (La.5/9/08), 980 So.2d 684. Whether a mistrial should be granted is within the sound ■ discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of discretion.
 
 Id.,
 
 at 11, 960 So.2d at 1114.
 

 It appears that defendant claims that the State’s elicitation from Hotard at trial that she was a paid informant, after the State previously objected to the defendant’s attempt to elicit the same information at the motion to suppress hearing, was prejudicial and interfered with defendant’s ability to obtain a fair trial.
 

 Defendant contends that she was unaware prior to Hotard’s trial testimony that Hotard was a previously paid informant. Defendant’s claim, however, is not supported by the record. At the pre-trial hearing, Hotard was asked if she had been paid before for giving information to the police and she answered that she had not been paid in a murder trial, explaining that there was a difference. Hotard’s answer implied that she may have been paid for information in another type of case.
 

 
 *850
 
 Additionally, defendant does not explain how the information of Hotard being a paid informant affected her ability to obtain a fair trial. The jury heard Hotard testify that she had previously been a paid informant. If anything, the fact Hotard had been a paid informant would appear to negatively affect her credibility to defendant’s benefit. Furthermore, to the extent defendant suggests that Hotard being a paid informant would have changed the trial court’s earlier ruling that 12fiHotard was not an agent of the State, the record shows the trial court was in fact aware that Hotard was previously a paid informant before ruling that she was not an agent of the State. At trial, the State pointed out that the trial court reviewed documents in camera and was aware that Hotard had been a paid informant years before the present incident. This assertion was not contradicted.
 

 Defendant did not show that she was prejudiced by Hotard’s trial testimony that she had been a paid informant in the past. As such, defendant failed to prove a ground upon which a mistrial could have been based and the trial court thus did not err in denying her motion for a mistrial.
 

 ASSIGNMENT OF ERROR NUMBER FOUR
 

 Defendant asserts that the trial court erred in allowing the State to use numerous gruesome photographs of the victim during trial. She contends that the close-up photos of the victim’s face had no probative value since the identification of the victim or the nature of the injury was not at issue. She claims that the cumulative photographs were used solely to inflame the jury’s passion and create prejudice against her.
 

 The record shows that six photographs of the victim taken at the scene before she was transported to the hospital were introduced during the testimony of Officer Ca-zalot, the first officer on the scene. Thereafter, during the testimony of Deputy Bennett, who saw the victim at the hospital, the State introduced six more photographs of the victim taken while she was at the hospital.
 
 [10]
 

 Generally, photographs are admissible if they illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, subject to the test that their probative value outweighs any | ^prejudicial effect.
 
 State v. Battaglia,
 
 03-692, p. 10 (La.App. 5 Cir. 11/25/03), 861 So.2d 704, 710,
 
 writ denied,
 
 04-1701 (La.4/29/05), 901 So.2d 1058. Photographic evidence is properly admitted unless it is so gruesome as to overwhelm the jurors’ reason and lead them to convict a defendant without sufficient evidence.
 
 State v. Broaden,
 
 99-2124, p. 23 (La.2/21/01), 780 So.2d 349, 364,
 
 cert. denied,
 
 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001).
 

 The cumulative nature of photographic evidence does not render it inadmissible if it corroborates the testimony of witnesses on essential matters.
 
 State v. Battaglia,
 
 03-692 at 10, 861 So.2d at 711. The trial court has considerable discretion regarding the admissibility of photographs and its ruling will not be disturbed absent an abuse of that discretion.
 
 State v. Gallow,
 
 338 So.2d 920, 923 (La.1976);
 
 State v. Addison,
 
 08-461, p. 16 (La.App. 5 Cir. 2/10/09), 8 So.3d 707, 718.
 
 [11]
 

 The State is entitled to the moral force of its evidence.
 
 State v. Koon,
 
 96-1208, p.
 
 *851
 
 34 (La.5/20/97), 704 So.2d 756, 776, cert.
 
 denied,
 
 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997). A defendant cannot control the State’s method of proof.
 
 Id.
 

 In the instant case, although the photographs of the victim’s injuries are disturbing, they depict the injuries sustained by the victim and are not so gruesome that they would have overwhelmed the jurors’ reason and led them to convict defendant based upon the photographs alone. The photographs show the victim after her injuries were attended to and are not bloody.
 

 Defendant was charged with second degree murder. The State therefore had the burden of proving that defendant had the specific intent to kill or to inflict great bodily harm. The photographs depict the nature of the injuries inflicted upon the lavictim. They therefore served to establish that defendant had the state of mind necessary to convict her of second degree murder.
 
 See State v. Ellis,
 
 42,286, p. 6 (La.App. 2 Cir. 7/11/07), 961 So.2d 636, 641,
 
 writ denied,
 
 07-1641 (La.1/25/08), 973 So.2d 753. Additionally, the photographs corroborate the testimony of the victim’s son and the officers regarding the victim’s injuries.
 

 Furthermore, the photographs do not appear to be cumulative. Some of the photographs show close-up and faraway views of the same injuries, and others show the injuries from different angles. See
 
 State v. Condley,
 
 04-1349, p. 19 (La.App. 5 Cir. 5/31/05), 904 So.2d 881, 893,
 
 writ denied,
 
 05-1760 (La.2/10/06), 924 So.2d 163.
 

 Defendant has failed to show that the photographs were more prejudicial than probative and that the trial court abused its discretion by admitting the photographs of the victim’s injuries taken at the scene of the beating and at the hospital into evidence. This assignment of error has no merit.
 

 ERRORS PATENT REVIEW
 

 Defendant requested an errors patent review. This Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920,
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975), and
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990), regardless of whether defendant makes such a request. This court’s review of the record reveals no errors patent.
 

 CONCLUSION
 

 We find no merit to the assignments of error asserted by defendant on appeal. Defendant’s conviction is accordingly affirmed.
 

 AFFIRMED.
 

 [1]
 

 . The appellate record does not contain the written motions to suppress, but contains transcripts of the hearings on the motions.
 

 [2]
 

 . Defendant's assignments of error are addressed out of order so the sufficiency of the evidence is addressed first in accordance with
 
 State v. Hearold,
 
 603 So.2d 731, 734 (La.1992).
 

 [3]
 

 . The crime lab technician who collected the blood evidence from the pants described them as "dark," dark enough that she could better visualize the blood stains by turning them inside out. Photos of the camouflage pants show that they contained black and dark green patches in the print.
 

 [4]
 

 . Although defendant unsuccessfully attempted to get the victim's earlier statement into evidence through Deputies Cazalot and Bennett and did not object to the trial court's rulings, defendant does not contend that the trial court improperly denied the admissibility of the statement at those times. Rather, defendant asserts on appeal that the victim's earlier statement was admissible through Mr. Ulfers, to whom the victim initially made the statement.
 

 [5]
 

 . It is well established that the appellate court is not limited to the evidence adduced at the pre-trial hearing but may also consider the evidence presented at trial in determining whether the trial court's ruling on a motion to suppress is correct.
 
 State v. Morton,
 
 08-164, p. 6 (La.App. 5 Cir. 7/29/08), 993 So.2d 651, 656. In
 
 State v. Banks,
 
 96-652, p. 6 (La.App. 5 Cir. 1/15/97), 694 So.2d 401, 406, n. 2, this Court applied the same rationale when reviewing the trial court's ruling on a motion to quash.
 
 See also State v. Roblow,
 
 623 So.2d 51, 55 (La.App. 1 Cir. 1993). Although there do not appear to be any cases extending this same rule to the review of a ruling on the admissibility of a dying declaration, there does not appear to be any reason why the same rationale should not apply.
 

 [6]
 

 . The admissibility of the statement under the dying declaration exception to the hearsay rule is not discussed since the statement is admissible under the excited utterance exception and the trial court first ruled it admissible as an excited utterance.
 

 [7]
 

 . The admissibility of this statement as a dying declaration is not discussed because of its admissibility as an excited utterance and the fact the trial court first ruled it admissible as an excited utterance.
 

 [8]
 

 . Prior to trial, defendant filed a motion to suppress her jailhouse confessions that she made to two inmates, Hotard and Christine Newman. Defendant asserted that the inmates were informants acting as agents of the State and argued that the State used the informants to circumvent her right to counsel. A pre-trial hearing was held on the motion, which was denied.
 

 [9]
 

 . In the present case, Hotard gave information to the police about defendant's confession in April 2007.
 

 [10]
 

 . Defense counsel did not object to the postmortem photographs of the victim, which were introduced during the testimony of Dr. Susan Garcia.
 

 [11]
 

 . A writ, 09-K-589, was filed with the Louisiana Supreme Court on March 16, 2009.