WINDHORST, J.
| |Defendant, Jacoby Maize, was found guilty of seven felony counts: second degree murder of Justin Hendricks, La. R.S. 14:30.1 (count one); aggravated second degree battery of Cecilia Cruz Maize, La. R.S. 14:34.7 (count two); two counts of possession of a firearm by a convicted felon, La. R.S. 14:95.1 (counts three and five); intimidation of a witness, namely Cecilia Cruz Maize, La. R.S. 14:129.1 (count four); aggravated arson, La. R.S. 14:51 (count six); and aggravated assault with a firearm of Cecilia Cruz Maize, La. R.S. 37.4 (count seven).[1] Defendant was sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence on count one; 15 years at hard labor on count two; 20 years at hard labor without the benefit of parole, probation, or suspension of sentence on count three; 40 years at hard labor on count four; 20 years at hard labor on count five; 20 years at hard labor on count six; and 10 years at hard labor on count seven. The trial court ordered that count two run consecutively to count one; count three run concurrently with count two, but consecutively to counts one, four, and five; counts four, five, and seven to run concurrently with all sentences; and count six to run consecutively to all counts. This appeal followed. For the reasons that follow, defendant’s convictions are affirmed, his sentences on counts one *639 through six are affirmed, his sentence on count seven is vacated, and the matter is remanded for resentencing on count seven and correction of the commitment.
Facts
One day in April 2011, around 4:00 A.M., Henry Linares was traveling with his friend on River Road, when he witnessed a house off of River Road on fire. They stopped, called the police and proceeded to knock on the doors of the houses in the area to alert them to the fire. The same day, in the early morning hours, Tito | gGuevara-Hernandez was sleeping on his mother’s couch when he heard someone screaming. He went to the window and witnessed the house next door on fire.[2] He woke up his mother and sister and they hid in the bathroom when he heard a knock on his front door. They stayed in the bathroom until he saw lights from an emergency vehicle. Mr. Guevara-Hernandez stated he was sitting outside on his front porch the night before the fire when he heard “arguing, fighting” coming from the house next door. He then heard “two shots and somebody ran away.” He stated that he hid in the bathroom with his family because he was afraid that someone was knocking on his door the day of the fire because of what he heard on his porch the night prior to the fire.
On April 26, 2011, approximately 4:30 A.M., Detective Anthony Gaudet, an arson investigator with the Louisiana State Fire Marshal’s Office, arrived at 112 Maine Street in Jefferson Parish to investigate a fire. He stated that the house was “basically, completely destroyed by the fire.” The body of Justin Hendricks was found in the kitchen, with a visible gunshot wound to his pelvis area. The neighbor’s home to the right was approximately fifteen to twenty feet away, and because of its close proximity, it also sustained damage from the fire that started at 112 Maine Street.
Detective Gaudet determined that the fire was not accidental or caused by a natural event, and that there was evidence indicative of human intervention in causing the fire. He also determined that there were two points of origin and that gasoline was used as an accelerant. Detective Gau-det further established that the gas meter at 112 Maine Street did not fail, nor was it a source of the fire’s origin. He testified that if the fire had reached the gas meter, an explosion would have occurred which potentially could have threatened the life of any of the individuals in the house next door. Investigator Thomas Lowe, an arson investigation | ¡¡supervisor with the Jefferson Parish Fire Department,[3] similarly determined that if the fire had reached the gas meter, the three people in the occupied residence next door “could have been seriously injured” because of a probable explosion. He concluded that the fire was intentionally set, and the fire was classified as an aggravated arson because it spread to the occupied residence next door.
Dr. Susan Garcia, a forensic pathologist with the Jefferson Parish Forensic Center, performed the autopsy of Mr. Hendricks. She testified that he sustaihed a single, distant-range[4] gunshot wound to his left side, which severed his femoral artery. The gunshot wound was the cause of death and his death was classified as a homicide.[5] She *640 also conducted a carbon monoxide level test to determine if the fire contributed to his death. Dr. Garcia concluded that Mr. Hendricks died before he was exposed to the fire.
Dr. Garcia also testified that' Mr. Hendricks had two sharp-force injuries to the ventral surface of his left forearm near his wrist.[6] She , determined that these. two wounds were made immediately before or after he sustained the gunshot wound. She further explained that wounds on extremities are usually classified as defensive wounds. While she could not say how Mr. Hendricks received those injuries,, she stated that the wounds were in a position on his body consistent with defensive wounds.[7]
Detective Rhonda Goff with the Jefferson Parish Sheriffs Office, was the su-. p.ervising detective in the murder .investigation of Mr. Hendricks. During the investigation, she discovered a 9-1-1 call that Mr. Hendricks made on April 25, 2011, at 1:23 A.M. Mr. Hendricks advised the 9-1-1 operator that defendant, | ¿Jacoby Maize, was at his home earlier that day and defendant beat his wife, Cecilia Cruz Maize (Ms. Cruz[8]) and struck her with a gun. Defendant and Ms. Cruz, subsequently left in a black Land Rover.
On April 29, 2011, defendant and Ms. Cruz were arrested after patrol officers conducted a traffic stop on a black Land Rover. Defendant was initially arrested for an-outstanding .warrant with the New Orleans Police Department- (NOPD) for an aggravated battery by shooting and Ms. Cruz was arrested on a probation violation.
Detective Goff interviewed Ms. Cruz- after she was arrested, and Ms. Cruz appeared “beat up.” She had a blood-like substance on her clothes,- and an “L-type shape” wound on her forehead, “consistent with the butt of a gun striking her on the forehead.” As a result of Ms. Cruz’s injuries, defendant was “booked” in Jefferson Parish with a felony count of domestic battery. -
Ms. Cruz characterized her relationship with defendant as “physical.” Defendant beat her “everyday” and “it happened numerous times.” He would beat her regardless of who was around and no one ever reported defendant to the police.[9]’ He used his hands and objects when he beat her. She recalled a specific occasion while she and defendant were living with Amanda Glynn.[10] Defendant stabbed her with a *641 knife, resulting in a hospital visit.[11] She also recalled an | ¿incident at Joan Rhode’s[12] home that occurred in April 2011 a few weeks before Mr. Hendricks’ death, when defendant shot a gun at her. He was angry with her, but she did not remember why he was mad because she stated she did not do anything wrong. Defendant used to make her walk with her head down and she was not allowed to look at other people.
Ms. Cruz met Mr. Hendricks through defendant. In April 2011, she and defendant were living in their vehicle, a black “Range Rover,” but it was impounded for lack of insurance. Mr. Hendricks helped her and defendant recover the vehicle by placing the vehicle on his insurance policy so they could retrieve their vehicle. She and defendant- were at Mr. Hendricks’ home on Easter Sunday, April 24, 2011. However, before they went to Mr. Hendricks’ home, she and defendant picked up three of their friends, including' Samer Abumusa, in New Orleans. She testified that because of her drug use, she was “asleep” for the entire ride in New Orleans.
On the morning of April 24, 2011, Mr. Abumusa was with defendant in defendant’s vehicle. Defendant was driving, Ms. Cruz was in the passenger seat, and he was in the backseat with Tiffany Frey and “Freddy.” Mr. Abumusa got into an argument with defendant because Ms. Cruz said “hello” to him. Defendant pulled over and parked the car, turned around and shot Mr. Abumusa. Although he got out of the. vehicle and tried to get -away from defendant, he was struck by three bullets before he was hit by a truck.[13] Officer Angel Wilson with the NOPD responded to a call of an aggravated battery by shooting on April 24, 2011, at the |flintersection of Tchoupitoulas and Upperline at approximately 10:30 A.M. involving defendant and Mr. Abumusa. She recovered two casings as well as a copper bullet from the scene.[14]
*642 After the shooting involving Mr. Abumu-sa, Ms. Cruz and defendant went to Mr. Hendricks’ home on the afternoon of April 24, 2011. Ms. Cruz testified that while at Mr. Hendricks’ house, they had a physical fight wherein defendant beat her with a lamp, and “with everything that he could find in that house.., for, at least, 30, 35 minutes.” She cried and screamed and had injuries that bled as a result of the beating. After the fight, they left Mr. Hendricks’ home.
Andrea Romano, a friend of Mr. Hendricks, spoke with Mr. Hendricks twice over the phone on Easter, April 24, 2011, in the evening.[15] He told her that a man and woman were in his house earlier and they fought. The man “pistol-whipped” the woman with a gun stamped with “LCPD,” which he thought meant Lake Charles Police Department. He also told her that there was blood everywhere. Mr. Hendricks said that they broke a lamp and he was cleaning up the blood while he was talking to her. Out of concern for his safety, Ms. Romano inquired if Mr. Hendricks had a gun. He told her that he did not because he was on probation, but he asked her if she “would feel better if he brought a knife.” She told him not to bring a knife to a gun fight. She subsequently spoke with Mr. Hendricks again on the phone and he told her that he was going to see the man later in the day because the man was bringing him money. Mr. Hendricks told her not to worry. Mr. Hendricks subsequently called 9-1-1 and reported the incident that occurred at his house between defendant and Ms. Cruz.
|7Ms. Cruz testified that she and defendant returned to Mr. Hendricks’ house later the same evening to do laundry. However, Mr. Hendricks did not want them at his house. Defendant ordered Ms. Cruz to return to, and remain in, the vehicle. Defendant went in Mr. Hendricks’ house. Ms. Cruz heard a gunshot and defendant ran out of the house. When defendant returned to the car, he said, “Justin might be dead” and he mumbled “something about not leaving no evidence.” Ms. Cruz stated that she was “hysterical” and started crying. Defendant pulled out a gun and hit her in the head with it, telling her that she “better not saying nothing” and that he would “kill” her little niece and her mother. She did not say anything more. The next night, she and defendant parked their vehicle on River Road near Mr. Hendricks’ house. Defendant got out of the vehicle and retrieved three water jugs full of gasoline from the trunk.[16] When he returned to the vehicle, he no longer had the containers full of gasoline. Ms, Cruz subsequently learned that Mr. Hendricks was dead and that his house had been burned.
Detective Goff established that Mr. Hendricks was killed sometime after he placed the 9-1-1 call at 1:22 A.M. on April 25, 2011, and before the fire became evident the next day, April 26, 2011, around 4:20 A.M. Detective Goff also established that after Mr. Hendricks placed the 9-1-1 call to report defendant beating Ms. Cruz, Mr. Hendricks called defendant at 2:07 A.M. The phone records showed that Mr. Hendricks’ and defendant’s phones both utilized a phone tower near Mr. Hendricks’ house on April 25, 2011, at 2:07 A.M. Moreover, defendant admitted that he spoke with Mr. Hendricks at that time.[17]
*643 IsAfter defendant was arrested on April 29, 2011, Detective Goff interviewed him on three different occasions.[18] During the first interview, defendant denied knowing anything about Mr. Hendricks’ murder. Detective Goff then played a portion of Mr. Hendricks’ 9-1-1 call for defendant. Defendant accused Mr. Hendricks of lying and denied beating Ms. Cruz. In the second interview,[19] defendant stated that he and Ms. Cruz went to Mr. Hendricks’ house on Easter but left by 6:00 P.M. After leaving Mr. Hendricks, they went to “Todd’s” on Kenner Avenue to fix his car and he spent the night. Detective Goff confirmed Todd’s identity, but Todd did not corroborate defendant’s statement regarding his whereabouts. Months after his first two statements, Detective Goff spoke with defendant a third time, at his specific request.[20] In his third statement, defendant implicated Ms. Cruz in Mr. Hendricks’ murder. Defendant stated that Ms. Cruz fought with Mr. Hendricks on Easter, that she returned to Mr. Hendricks’ house later in the day and shot him. Defendant also stated that Ms. Cruz set Mr. Hendricks’ house on fire after leaving him by the car. During the interview, defendant further admitted having a Glock during the time period in question and that he paid $150.00 for a second gun that Ms. Cruz possessed. He stated that the second gun was used by Ms. Cruz to murder Mr. Hendricks.[21]
At trial, defendant explicitly denied shooting Mr. Hendricks, setting Mr. Hendricks’ house on fire, and hitting Ms. Cruz with a gun. He also denied shooting a gun at Ms. Cruz while at Ms. Rhode’s home, denied stabbing Ms. Cruz, and denied shooting Mr. Abumusa. Defendant admitted that he and Ms. Cruz had | fla fight at Mr. Hendricks house. He stated that he did not hit her with a lamp; the lamp “inadvertently hit her.” He pushed her over the coffee table and she landed on the sofa with her hand hitting the lamp, which fell on her. However, in his statement he stated that he “pushed the lamp down on her and the lamp hit her in the top of the head,” and he “hit her with the lamp thing.” Defendant conceded that he made Ms. Cruz bleed from the injuries he inflicted on her at Mr. Hendricks’ house, but argued that he did not beat her with a dangerous weapon. He specifically denied hitting Ms. Cruz with a gun. Defendant further admitted that he and Ms. Cruz got into physical fights, but he stated that she hit him sometimes. Moreover, defendant admitted that he “choked her” and *644 “smacked her,” but repeatedly denied that he “beat” Ms. Cruz. Defendant also testified that all of the State’s witnesses were lying and that he was the only one being truthful.
Defendant testified that he was asleep at Ms. Cruz’s friend Amanda’s house when Ms. Cruz called Amanda on the morning of April 25, 2011. Amanda woke him up and brought him to meet Ms. Cruz at Danny and Clyde’s on Clearview Parkway at approximately 7:00 A.M. Defendant stated that he and Ms. Cruz rode around and talked. He specifically denied having possession of his cell phone at 4:34 A.M, 4:37 A.M, and 4:49 A.M., on April 25, 2011, when calls were placed from Kenner to Mr. Hendricks. Defendant testified that Ms. Cruz had his phone during those calls and shortly before Mr. Hendricks was murdered. However, defendant subsequently stated that after he and Ms. Cruz left Mr. Hendricks’ house on Easter, they parked over by Pasadena Avenue in Me-tairie. While they were parked, his vehicle was approached by patrol officers because of potentially suspicious conduct because the vehicle was parked for a period of time. The police did not find anything after conducting a search of the vehicle and he was not taken into custody. He stated that later that night he went to Amanda’s house, took some pills and went to sleep. He testified that it was his sister Amanda’s house, not ImAmanda Glynn’s house. His sister was the one who took him to Danny and Clyde’s in the morning, not Ms. Glynn.
During his testimony, defendant admitted that he possessed a firearm, a Glock, on April 24, 2011, and on April 25, 2011. He explicitly stated that he carried his firearm “every day,” even though he admitted to pleading guilty in January 2009, in case number 07-703, to possession of MDMA, possession with intent to distribute cocaine, and simple possession of marijuana. He stated that because the State admitted it did not have his firearm (the Glock) in its possession, he was not guilty of the two- charges of possession of a firearm by a convicted felon on April 24, 2011, and April 25, 2011.
Defendant further testified that Ms. Cruz shot Mr. Hendricks in self-defense. He testified that Ms. Cruz needed a “fix” and realized she left her purse at Mr. Hendricks house on Easter in the afternoon. When she retrieved her purse, she and Mr. Hendricks argued and she shot him in self-defense. Defendant stated he was not present at the time Mr. Hendricks was shot because he was visiting his grandfather at the hospital. Defendant also stated that he was not with Ms. Cruz went she set Mr. Hendricks’ house on fire. Defendant admitted that he and Ms. Cruz discussed setting Mr. Hendricks’ house on fire, ie., he gave her advice about where to start the fire—“where the blood is,” but testified that it was not his idea. He testified that he “mistakenly” admitted in his third statement that it was his idea to set the fire.
Discussion
In his first counseled assignment of error, defendant contends that the trial court erred in denying his motion to sever counts two, three, and seven from the other four counts. He argues that counts one, four, five, and six relate to the same incident, while the other three counts relate to separate incidents. Defendant contends that count seven only served to portray him as a “bad guy” and Ms. Cruz |nas a victim. Defendant alleges that evidence of domestic abuse allegedly committed against Ms. Cruz by him hindered his defensive strategy because he claimed that Ms. Cruz shot Mr. Hendricks and set his house on fire.
Defendant claims that the failure to sever the counts, especially count seven, 1) *645 made the jury more hostile; 2) caused the jury to intertwine the evidence; 3) caused the jury to not hold the State to its burden of-proof on all of the other counts charged; and 4) enabled the jury to infer a criminal disposition from the combined counts. Defendant concludes that he was extremely prejudiced by the joinder of offenses and that the jury’s verdict cannot be considered unattributable to this error.
The amended indictment charged defendant with the second degree murder of Justin Hendricks, alleged to have occurred on April 25, 2011 (count one); aggravated second degree battery of Cecilia Cruz Maize, alleged to have occurred on April 24, 2011 (count two); two counts of possession of a firearm by a convicted felon, alleged to have occurred on April 24, 2011, and April 25, 2011, respectively (counts three and five); intimidation of a witness, namely Cecilia Cruz Maize, alleged to have occurred-on April 25, 2011 (count-four); aggravated arson of Mr. Hendricks’ residence, alleged to have occurred on April 26, 2011 (count six); and aggravated assault with a firearm of Cecilia Cruz Maize, alleged to have occurred in April 2011 (count seven). -- ■
Prior to trial, defendant filed a motion to sever the offenses pursuant to La. C.Cr.P. art. 495.1, specifically to sever the counts involving Mr. Hendricks as the victim, from the counts involving Ms. Cruz as the victim.[22] He argued that the charges involving Mr. Hendricks are separate and distinct from the charges involving Ms. Cruz and that the joinder of these offenses would only confuse and prejudice the jury against defendant. The prejudice to defendant would | ^overshadow any consideration of judicial economy. The trial court denied defendant’s motion, finding that it was “an appropriate joinder of all of the counts,” and if there were any issues concerning a prejudicial effect, it would “handle those issues in instruction to the Jury.”
La. C.Cr.P, art. 493 permits the joinder of offenses if the offenses charged “are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan,” and the offenses are triable by the same mode of trial.
Felony offenses not triable by the same mode of trial may still be joined in the same bill of information under the conditions specified in La. C.Cr.P. art. 493.2, which provides:
Notwithstanding the provisions of Article 493, offenses in which punishment is -necessarily confinement at hard labor may be charged 'in the same indictment or information with offenses in which the punishment may be confinement at hard labor, provided that the joined offenses are of,the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
While we note that count seven may have been improperly joined in the indictment because it was not based on- the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan as were the remaining counts, this issue was not preserved for appeal. A mis-joinder of offenses can only be urged by a motion to quash the indictment. La. C.Cr.P. art. 495. Defendant did not file a motion to quash the indictment on the basis of misjoinder of offenses. Where a defendant fails to file a motion to quash the indictment or informátion, the defen *646 dant is deemed to have waived any objection to the misjoinder of offenses. State v. Mallett, 357 So.2d 1105 (La. 1978), cert. denied, 439 U.S. 1074, 99 S.Ct. 848, 59 L.Ed.2d 41(1979);[23] State v. Robinson, 11-12 (La. App. 5 Cir. 12/29/11), 87 So.3d 881, 910; State v. Favors, 09-413 (La. App. 5 Cir. 11/10/09), 28 So.3d 433, 441. Thus, because defendant failed to file a motion to quash the indictment based on the misjoin-der of offenses, we find that he waived any objection to the error under La. C.Cr.P. art. 495. See also, State v. Collins, 04-255 (La. App. 5 Cir. 10/12/04), 886 So.2d 1149, writ denied, 04-2798 (La. 03/11/05), 896 So.2d 62.
Nevertheless, a defendant may move for a severance of the offenses under La. C.Cr.P. art. 495.1. “If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.” La. C.Cr.P. art. 495.1. (Emphasis added.) In this case, defendant filed a motion to sever based on prejudicial joinder of offenses that was denied by the court.
The trial court must consider the following factors in determining whether prejudice results from a joinder of offenses: 1) whether the jury would be confused by the various counts, 2) whether the jury would be able to segregate the various charges and evidence, 3) whether the defendant would be confounded in presenting his various defenses, 4) whether the crimes charged would be used by the jury to infer a criminal disposition, and 5) whether, considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Fontenberry, 09-127 (La. App. 5 Cir. 10/27/09), 27 So.3d 904, 909-910, writ denied, 09-2665 (La. 05/28/10), 36 So.3d 246. Additionally, the trial court must consider whether prejudice from the joinder of offenses can be mitigated by clear jury instructions and by an orderly presentation of evidence by the State. State v. Davis, 12-512 (La. App. 5 Cir. 04/24/13), 115 So.3d 68, 84, writ denied, 13-1205 (La. 11/22/13), 126 So.3d 479.
In its determination of whether charged offenses should be severed for trial, the trial court may consider whether evidence of one offense would have been admissible as other crimes evidence at the trial of the other offense. La. C.E. art. 404 B(1); State v. Prieur, 277 So.2d 126 (La. 1973); State v. Butler, 08-662 (La. App. 5 Cir. 05/26/09), 15 So.3d 1091, 1102, writ denied, 09-1513 (La. 03/05/10), 28 So.3d 1004. However, the fact that evidence of one of the charges would not be admissible under Prieur in a separate trial on the joined offense does not, per se, prevent the joinder and single trial of both crimes if the joinder is otherwise permissible. State v. Deruise, 98-0541 (La. 04/03/01), 802 So.2d 1224, 1232, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001). A close connexity of res gestae or integral act evidence is required to insure that the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. State v. Noten, 01-1818 *647 (La. 06/25/01), 791 So.2d 607, 608-09 (per curiam).
A defendant alleging a prejudicial joinder of offenses has a heavy burden of proof. Motions to sever under La. C.Cr.P. art. 495.1 are within the sound discretion of the trial court and its ruling will not be disturbed on appeal absent an abuse of discretion. Factual, rather than conelusory allegations are required when the defendant alleges prejudicial joinder of offenses on a motion to sever. Fontenberry, 27 So.3d at 910. There is no prejudicial effect from joinder of offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations. State v. Butler, 15-89 (La. App. 5 Cir. 07/29/15), 171 So.3d 1283, 1288, writ denied, 15-1608, 207 So.3d 408, 2016 WL 6238013, 2016 La. LEXIS 1868 (La. 10/10/16).
| ^Defendant did not meet his heavy burden of proving prejudicial joinder. The State presented its case in a logical fashion and in such a manner as to keep the evidence pertaining to each count and each victim separate and distinct. Also, the trial court charged the jury separately as to each offense, explaining in detail what the State was required to prove with respect to each count. Further, defendant did not make any specific factual allegations that the joinder of the offenses allowed the jury to infer a criminal disposition or made the jury hostile. Even if the trial court had severed the counts, the evidence regarding the crimes against Ms. Cruz relative to count seven would have been admissible in the murder case, as discussed in more detail in assignment of error two. Moreover, the record lacks any evidence indicating that the jury was hostile or incapable of considering multiple offenses without inferring a criminal disposition. Accordingly, the trial court did not abuse its discretion in denying defendant’s motion to sever.
In his second counseled, assignment of error, defendant argues that the trial court erred in admitting- evidence of other crimes. He claims that the other crimes evidence only served to portray him as a person of bad character. Specifically, he argues the testimony of Ms. Glynn was prejudicial because she testified that defendant sold her heroin and that he possessed and shot a gun at her home weeks before the murder. He also contends the testimony of Ms. Rhode was prejudicial because she testified that defendant sold her heroin and that she witnessed defendant “pistol whip” Ms. Cruz'a few weeks before the murder. He argues that because he was not charged with a drug offense, testimony regarding him selling drugs was irrelevant to the charges before the jury and was prejudicial. Further, he claims that neither Ms. Glynn nor Ms. Rhode was a witness to any of the crimes charged, and their testimony only served to show him as a person of bad character.
He also argues that the testimony of Mr. Abumusa was prejudicial because Mr. Abumusa testified defendant shot him and that he witnessed defendant beat |1fiMs. Cruz with a baseball bat. Defendant attacks the credibility of Mr. Abumusa and claims that his testimony was erroneously admitted because it was extremely prejudicial. He further contends that the trial court’s “repeated and late granting” of the State’s requests to admit other crimes evidence, combined with the joinder of all seven offenses in one trial, made it impossible for defendant to receive a fair trial.
On December 22, 2015, and December 28, 2015, the State filed a 404 B notice and *648 a Supplemental 404 B notice[24] that it would introduce other crimes evidence. The notices referred to Ms. Glynn's statement that defendant sold her heroin.and that she observed defendant in possession of a firearm. The State argued that the weapon was consistent with the weapon used to beat Ms. Cruz and the weapon potentially used to murder Mr. Hendricks. The notices also referred to Ms. Rhode’s statement that she witnessed defendant “pistol whip” Ms. Cruz after she heard a gunshot. The State claimed that this evidence showed that defendant had the criminal intent-to harm Ms. Cruz, motive, opportunity, an absence of mistake or accident, and identity as it related, to him being the perpetrator of offenses against Ms. Cruz and the perpetrator of the other charged offenses.
On February 12, 2016, the State filed an additional 404 B notice with regard to Mr. Abumusa’s statement that defendant shot him hours before the criminal conduct charged in this indictment and that he witnessed defendant beat Ms. Cruz with a baseball, bat. The State .argued that this evidence served to establish defendant’s criminal intent, motive, opportunity, absence of mistake, and identity as the perpetrator of the charged offenses.
Defendant filed objections to all of the State’s 404 B notices. Regarding Ms. Glynn and Ms. Rhode, defendant argued that the State should be precluded from introducing this evidence based on the State’s untimely notice. Defendant also |17argued that the State failed to state' a legitimate reason why the evidence of other crimes should be admitted at trial. Any probative value the evidence may have would be grossly and substantially outweighed by its prejudicial effect against defendant. As to Mr, Abumusa’s testimony, defendant argued that the notice was untimely and that the introduction of this evidence would be prejudicial to him..
At the motion hearing, the trial- court: 1) deferred its ruling on the testimony of Ms. Glynn and Ms. Rhode finding that it would need to “make its rulings in the context of the testimony that comes out at trial,” 2) denied the objection as to defendant’s timeliness argument, and 3) denied the objection as to the testimony of Mr, Abumusa.
Generally, a court may not admit evidence of other crimes to show a defendant is a person of bad character, and that he has acted in conformity with his bad character. State v. Napoleon, 12-749 (La. App. 6 Cir. 06/16/13), 119 So.3d 238, 242. However, the State may introduce evidence of other crimes, wrongs, or acts if it establishes an independent and relevant reason for its admissibility, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. Id.; La. C.E. art. 404 B(l). Such evidence is also admissible when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceed-. ing. La. C.E. art. 404 B(l).
Res gestae events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the State could not accurately present its case without reference to them. Napoleon, 119 So.3d at 242. Close proximity in time and location is required between the charged offense and the other crimes evidence to insure that the purpose served by admission of other crimes evidence is not to depict defendant *649 as a bad man, or that defendant acted in conformity with the crime, but rather to complete the story of the crime for which he is on trial by proving its immediate context of • happenings near in time and place. Id.; State v. Colomb, 98-2813 (La. 10/01/99), 747 So.2d 1074, 1076. The res gestae doctrine is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime but also testimony .of witnesses and police officers pertaining to what they heard or observed during .or after the commission of the crime, if a continuous chain of events is evident under the circumstances. State v. Taylor, 01-1638 (La. 01/14/03), 838 So.2d 729, 741, cert. denied, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004). The test of whether res gestae evidence is admissible is not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive its case of narrative momentum and cohesiveness, with power not only to support conclusions, but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. Colomb, 747 So.2d at 1076.
In order for other crimes evidence to be admitted under La. C.E. art. 404 B(l), one of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged. State v. Jackson, 625 So.2d 146, 149 (La. 1993). Further, the probative value of the extraneous evidence must outweigh its prejudicial effect. La. C.E. art. 403. The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence. State v. Dauzart, 02-1187 (La. App. 5 Cir. 03/25/03), 844 So.2d 159, 165-66. Absent an abuse of discretion, a trial court’s ruling on the admissibility of evidence pursuant to La. C.E. art 404 B(1) will not be disturbed. State v. Williams, 02-645, p. 16 (La. App. 5 Cir. 11/26/02), 833 So.2d 497, 507, writ denied, 02-3182 (La. 04/25/03), 842 So.2d 398.

Trial Testimony: Amanda Glynn and Joan Rhode

Ms. Glynn testified that while defendant and Ms. Cruz were living with her in January and February 2011, she witnessed defendant stab Ms. Cruz with a knife. liflShe also testified that she witnessed repeated acts of physical violence by defendant against Ms. Cruz where defendant would “hit on her” with “his fist, or objects, or whatever.” She further testified that she observed defendant with a gun that “had some kind of police stamp on.it.”
- Ms. Rhode testified that she “bought drugs” from defendant and Ms. Cruz. She testified defendant was abusive to Ms. Cruz in that he “beat her all the time” and he “beat her down.” She also testified regarding the incident at her house where defendant shot at Ms. Cruz. She heard a gunshot and then witnessed defendant beating Ms. Cruz in the head with a gun. She subsequently gave the police the projectile from the hole in her floor and the shell casing which were found in her house after the incident.
Defense-counsel did not object to the testimony of Ms. Glynn or Ms, Rhode at trial. At the pretrial hearing on the 404 B notice, the trial court deferred ruling on the admissibility of the other crimes evidence regarding Ms. Glynn’s and Ms. Rhode’s testimony until trial. When a defendant does not object to the trial court’s failure to rule on a motion prior to trial, the motion is considered waived. State v. Rivera, 13-673 (La. App. 5 Cir. 01/31/14), 134 So.3d 61, 66, Further, there is no indication that defendant objected to the *650 lack of a ruling. Therefore, we find that defendant waived any right to raise the issue on appeal regarding the admissibility of the testimony of Ms. Glynn and Ms. Rhode.
Nevertheless, the testimony of Ms. Glynn and Ms. Rhode was properly admitted. Their accounts of defendant perpetrating acts of violence upon Ms. Cruz were relevant to show the volatile nature of the relationship between him and Ms. Cruz, the victim in some of the charged offenses. Additionally, references to defendant’s repeated abuse of Ms. Cruz are highly probative of the elements of “intimidate ... by threat of force,” charged in count four, by showing that the defendant had the wherewithal to harm Ms. Cruz and her family, as opposed to justj^making idle threats. See e.g., State v. Brown, 95-124 (La. App. 5 Cir. 05/30/95), 656 So.2d 1070, 1075.
Also, accounts of prior domestic violence inflicted upon Ms. Cruz show defendant’s control over Ms. Cruz, which repudiates defendant’s contention that Ms. ’ Cruz was the true perpetrator of the crimes. See State v. Altenberger, 13-2518 (La. 04/11/14), 139 So.3d 510, 516. Furthermore, the brief testimony by Ms. Rhode that she bought drugs from defendant and Ms. Cruz, aided in putting into context her relationship with defendant and helped explain why Ms. Rhode was not the. most forthcoming in reporting the crimes she witnessed committed by defendant. Moreover, this brief reference was unlikely to be prejudicial because during his testimony, defendant admitted to having convictions for possession with intent to distribute cocaine, possession of MDMA, and simple possession of marijuana.

Trial Testimony: Samer Abumusa

Mr. Abumusa testified that he was with defendant on' the morning of April 24, 2011. He and defendant got into an argument because Ms. Cruz said “hello” to him, and defendant then shot him. He testified that he was struck by three bullets. He also testified that a few weeks before this incident, he witnessed defendant hit Ms. Cruz in the head with a baseball bat. Defendant told Ms. Cruz to “kiss the floor, and when she bent over to kiss the floor he hit her in the back of the head with a baseball bat.”
Evidence of the shooting involving defendant and Mr. Abumusa the morning of April 24, 2011, is admissible res gestae evidence. The shooting of Mr. Abumusa began a chain of events that ended with the murder of Mr. Hendricks and Mr. Hendricks’ house being set on fire. All of the events and crimes charged in the indictment, except for count seven, occurred over a three-day span. See Taylor, supra. Moreover, defendant was initially arrested because of the outstanding | ¾1 warrant relating to the shooting of Mr. Abumusa. Also, the gun used in the shooting of Mr. Abumusa was shown to be the same gun used in the shooting involving defendant and Ms. Cruz at Ms. Rhode’s house. Further, it was the State’s contention that the same gun was used to batter Ms. Cruz and shoot Mr. Hendricks. As to Mr. Abumusa’s testimony about defendant hitting Ms. Cruz -with a baseball bat earlier in April 2011, that testimony is admissible to show the violent acts defendant inflicted upon Ms. Cruz, a victim in. some of the charged offenses and a witness to the other charged offenses.
In his third counseled assignment of error, defendant argues that the trial court erred in denying defendant’s motion in limine to exclude the 9-1-1 call made by Justin Hendricks and the hearsay testimony of Andrea Romano. Defendant contends the admission of the 9-1-1 call violated his constitutional right to confrontation. He argues it should not have fallen under the *651 excited utterance exception because it was made four to five hours after the incident Mr. Hendricks claimed to have observed. He also contends the statement was self-serving, testimonial, and was not a response to an ongoing emergency. Defendant further contends Ms. Romano’s testimony should not have fallen under the excited utterance exception because it was not close in time, not in response to an inquiry, and was possibly self-serving.

9-1-1 Call of Justin Hendricks

On December 80, 2015, defendant filed a motion in limine to exclude all statements made by Justin Hendricks, the 9-1-1 call made by Justin Hendricks, and all testimony by law enforcement agencies regarding statements made by Justin Hendricks. Defendant argued that these hearsay statements violated his right to confrontation because no emergency existed at the time of the call and were therefore inadmissible testimonial hearsay. The State argued that the 9-1-1 call was made because of an ongoing emergency, which qualified it as non-testimonial [ 22hearsay. The State contended that because the 9-1-1 call qualified as non-testimonial hearsay, it would be subject to exceptions to the hearsay rules, such as excited utterance and then existing state of mind. The court denied the motion.
At trial, in regard to defendant’s motion to exclude a portion of the 9-1-1 call, defense counsel and the State discussed the contents of the 9-1-1 call -with the trial court prior to- submission. The State informed the trial court that it would willingly excise some portions of the call as requested by the defendant, but disputed a few remaining requests by defendant. The State and defendant submitted the remaining disputed portions of the 9-1-1 call to the court in a joint exhibit to determine its admissibility. The trial court ruled that some ádditional portions were to be excised. Neither party objected to the trial court’s ruling. The State and defense then agreed that a statement to the jury should be made that they “jointly agreed that certain portions of the 9-1-1 call are not relevant, and we have all agreed that only the relevant portions should be played.” The 9-1-1 call was subsequently admitted with “no objection.” Defendant did not contemporaneously object to the introduction of the 9-1-1 call; rather he acquiesced. Defendant waived his prior objection to the 9-1-1 call and did not preserve this issue for review on appeal. La. C.Cr.P. art. 841.[25]

Conversation with Andrea Romano

On December 30, 2015, defendant filed a motion in limine, arguing that any testimonial evidence from Andrea Romano alluding to conversations she had with Justin Hendricks should be excluded as hearsay and if permitted would be prejudicial.[26] The State contended that the hearsay testimony of Ms. Romano [««would be subject to the excited utterance exception. The trial court deferred ruling on Ms. Romano’s testimony until trial.
At trial, before testimony from Ms. Romano was elicited, defense counsel objected based on the hearsay nature of the statements and moved for a hearing pursu *652 ant to La. C.E. art. 104(a)[27] to determine the admissibility of the evidence. Outside the presence of the jury, Ms. Romano' testified that she regularly spoke .with Mr. Hendricks in the months leading up to his death. When she spoke with him the first time on April 24, 2011, he was. “agitated and excited,” and she could “tell he was moving around and his conversation was kind of all over the place.” Mr. Hendricks was “speaking quickly” and would “tell one part of the story here,. and then jump to something else, and then come back to this part of the story.” She categorized his behavior as out of the ordinary. He was “speaking more loudly than usual and more choppy than usual” and she felt based on all of these behaviors that he was “panicky and agitated.” During this first conversation,[28] Mr. Hendricks related that a couple was at his house earlier, they had a fight, the man “pistol-whipped” the woman, the man owed him money, and that he was going to .meet the man later that evening. Mr. Hendricks stated that he was cleaning up the blood from the incident while he was on the phone. •'
^Because he was cleaning up blood from the fight, the State argued that Mr. Hendricks actions -“would indicate that it’s an ongoing event” and Mr. Hendricks “evidenced an intent to meet the defendant thereafter.” The State offered’ Ms. Romano’s testimony as exceptions to the hearsay rule,’ namely an excited utterance and as a statement regarding then existing state of mind. Defense counsel objected and argued that the contents of the call constituted hearsay because Ms. Romano could not provide a time for when the events Mr. Hendricks described unfolded. The court overruled defendant’s objection to Ms. Romano’s testimony.
Hearsay is an out-of-court state-' ment, other than one made by the witness, offered to prove the truth of the matter asserted in the statement. La. C.E. art. 801C. Hearsay evidence is generally inad *653 missible unless otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802. An excited utterance is an exception to the hearsay rule. It is defined as “A statement relating to a startling event or condition made while the declar-ant was under the stress of excitement caused by the event or condition.” La. C.E. art. 803(2). Two requirements must be met for the excited utterance exception to apply: (1) there must have been an event sufficiently startling to render a declar-ant’s normal reflective thought process inoperative, and (2) the statement must have been a spontaneous reaction to the event and not the result of reflective thought. State v. Henderson, 362 So.2d 1358, 1362 (La. 1978); State v. Ramirez, 09-350 (La. App. 5 Cir. 12/29/09), 30 So.3d 833, 844; State v. Hester, 99-426, p. 14 (La. App. 5 Cir. 09/28/99), 746 So.2d 95, 106, writ denied by State v. Patterson, 99-3217 (La. 04/20/00), 760 So.2d 342.
The most important factor in determining whether a statement was made under the stress of a startling event is time. Id. Other factors include whether the statement is self-serving or in response to an inquiry, whether the statement expands beyond a description of events to include past or future facts, and li>s“ ‘whether the interval between the event and the statement was long enough .to permit a subsidence of emotional upset and a restoration of a reflective thought process.’” State v. Ramirez, 09-350 (La. App. 5 Cir. 12/29/09), 30 So.3d 833, 844, (quoting State v. Hilton, 99-1239 (La. App. 1 Cir. 03/31/00), 764 So.2d 1027, 1035, writ denied, 00-958 (La. 03/09/01), 786 So.2d 113). A trial judge’s determination regarding admissibility of evidence will not be overturned on appeal absent a clear abuse of the trial judge’s discretion. State v. Odoms, 01-1033 (La. App. 5 Cir. 03/26/02), 815 So.2d 224, 230-31, writ denied, 02-1185 (La. 11/22/02), 829 So.2d 1037.
The trial court did not abuse its discretion in admitting Ms. Romano’s testimony. During her testimony, Ms. Romano stated that Mr. Hendricks told her that a man and woman had a fight at his home earlier that day, April 24, 2011. He stated that the man “pistol-whipped” the woman 'and there was “blood everywhere.” Although it is unclear how long after the fight between defendant and Ms, Cruz that Mr. Hendricks’ spoke with Ms. Romano, Mr. Hendricks stated that he was cleaning up blood from the incident while he was on the phone with her.[29] Ms. Romano described Mr. - Hendricks demeanor as out of the ordinary because he was agitated and excited, and spoke in a disjointed manner. Mr. Hendricks’ statements to Ms. Romano were not self-serving or made in response to an inquiry, and were in close proximity to the fight such that Mr. Hendricks was still upset about it when he spoke to Ms. Romano. Therefore, Mr. Hendricks’ statements were properly admitted under the excited utterance exception to the hearsay rule.
However, even assuming these statements did not qualify as excited utterances, and were inadmissible hearsay, the admission of hearsay testimony is | ^harmless error where the effect is merely cumulative or corroborative of other testimony adduced at trial. State v. Williams, 09-48 (La. App. 5 Cir. 01/27/09), 28 So.3d 357, 367, writ denied, 09-2565 (La. 05/7/10), 34 So.3d 860 (citing State v. Johnson, 389 So.2d 1302 (La. 1980)). Ms. Cruz *654 testified that she was at Mr. Hendricks’ home on April 24,2011, and that defendant beat her, but she could not remember if he hit her with a gun. However, Detective Goff testified that when Ms. Cruz was arrested, she had an “L-type shape” wound on her forehead which was “consistent with being pistol whipped.” Additionally, defendant conceded that he made Ms. Cruz bleed from the injuries he inflicted on her at Mr. Hendricks’ house. Thus, Ms. Romano’s testimony appears to be cumulative. Based on the foregoing, if the statements were improperly admitted, it was harmless error.
In his pro se assignment of error, defendant contends that his convictions were based on ineffective assistance of trial counsel.[30] Defendant did not specifically assign as error the ineffectiveness of counsel, but he argues that his convictions were based upon numerous failures of his trial counsel that rendered their assistance ineffective. He contends that both of his trial counsel were ineffective by 1) failing to subpoena certain witnesses to testify at trial that would have supported his version of events, including Ms. Cruz’s probation officer and a pathologist who was hired by the defense; 2) failing to give a closing argument; 8) failing to impeach the testimony of Ms. Rhode; 4) failing to quash the indictment based on Ms. Rhode’s testimony; and 5) failing to strike potential jurors during voir dire.
The Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution safeguard a defendant’s right to effective assistance 1 a7of trial counsel. State v. Thomas, 12-1410 (La. 09/04/13), 124 So.3d 1049, 1053. According to Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant asserting an ineffective assistance claim must show: 1) that defense counsel’s performance was deficient and 2) that the deficiency prejudiced the defendant. The defendant has the burden of showing that “there is a reasonable probability that, but for counsel’s unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
Generally, an ineffective assistance of counsel claim is most appropriately addressed through an application for post-conviction relief filed in the district court, where a full evidentiary hearing can be conducted, rather than by direct appeal. However, when the record contains sufficient evidence to rule on the merits of the claim and the issue is properly raised in an assignment of error on appeal, it may be addressed in the interest of judicial economy. State v. Jones, 13-99 (La. App. 5 Cir. 08/27/13), 123 So.3d 758, 765.
An alleged error that is within the ambit of trial strategy does not establish ineffective assistance of counsel because “opinions may differ on the advisability of such a tactic.” State v. Singleton, 05-634 (La. App. 5 Cir. 02/14/06), 923 So.2d 803, 811, writ denied, 06-1208 (La. 11/17/06), 942 So.2d 532.
The election to call or not call a particular witness is a matter of trial *655 strategy and is not per se evidence of ineffective assistance of counsel. State v. Washington, 00-1312 (La. App. 5 Cir. 05/16/01), 788 So.2d 596, 607, writ denied, 01-1718 (La. 05/03/02), 815 So.2d 94. Prior to jury selection, a discussion took place on the record in camera concerning an incident involving defendant’s 1 ^behavior.[31] During this discussion the issue of trial counsel refusing to call certain witnesses that defendant wanted to call was discussed with the court. Defendant stated that he wanted the defense’s expert pathologist to testify. Defendant contended that he was informed by his trial counsel that it was too expensive to fly the pathologist in from Texas and the testimony was not relevant. Trial counsel explained that the reason they were not flying the pathologist in was not financial; rather the pathologist did not “bolster” defendant’s case and actually supported the State’s case. Trial counsel stated that defendant disagreed with them regarding the interpretation of the pathologist’s report. Thus, defendant was aware of trial counsels’ reason for not calling the pathologist and he did not further object to this trial strategy while discussing the matter with the trial court. This argument is without merit. However, the ineffectiveness of trial counsels’ failure to call the probation officer as a witness cannot be determined by review of the record on appeal. Accordingly, this claim is relegated to post-conviction relief proceedings, if any.
With regard to defendant’s claim that counsel did not impeach Ms. Rhode with her Grand Jury testimony, this claim is without merit. The transcript shows that Ms. Rhode was extensively cross-examined by defense counsel regarding her testimony to the Grand Jury and the fact that she did not tell them the truth. Ms. Rhode admitted that she did not tell the Grand Jury that she “heard” the gunshot during the incident at her house because she was “terrified” of defendant. She further conceded that she lied under oath to the Grand Jury. Thus, trial counsel was not ineffective because the jury heard testimony from Ms. Rhode concerning her lying under oath to the Grand Jury.
The record is insufficient to determine defendant’s claim for ineffective assistance of counsel for failing to file a motion to quash the indictment based on |aflMs. Rhode’s perjured testimony to the Grand Jury. Therefore, this claim is referred to post-conviction proceedings, if any.
Defendant’s claim regarding trial counsels’ failure to strike jurors is also without merit. Defendant argues that “Juror Graham” should have been stricken because she was a victim of the crime of murder for hire and her husband was the defendant. Defendant contends that the juror had the same issue with her husband as defendant and Ms. Cruz. He claims that the Ms. Graham would be more sympathetic to Ms. Cruz and would be moved by her own situation. Thus, she would deny him a fair trial. Defendant contends that “Juror Toussell” should have been stricken because five years prior, he was arrested for drugs and theft, was placed on probation and was currently waiting for ex-pungement. Also, Mr. Toussell’s father was a narcotic detective. Defendant argued that this juror “compromised the integrity of the jury selection process and contaminated the 14 person jury.” Defendant further argues that trial counsel failed to strike “Juror Champagne.” She admitted that she knew two of the State’s witnesses, Tom Lowe (and his son) and Captain Bar- *656 ríos, and that it would not affect her ability to be impartial.
■ Defendant did not show that the jurors would have been subject to a meritorious challenge for cause, and that trial counsel’s performance rendered the ' proceedings fundamentally' unfair or his convictions suspect. Juror Cora Graham stated that the crime committed against her occurred in the 1970’s.- She stated that this fact would not affect her ability to serve as fair and impartial juror. Juror Denise Champagne testified that her husband was retired from the Jefferson Parish Fire Department. She stated that she knew two of the State’s witnesses, Captain Barrios and Tom Lowe (and Tom’s son) because of her husband’s employment, but she did not know them “socially.” Ms. Champagne stated that it “wouldn’t have any bearing on me being.able to be impartial.” Juror Ryan Toussel stated that |anhe had been arrested before, but not convicted. He went to diversion, completed the program and was waiting on his expungement. He stated that this would not affect his ability to serve as a fair and impartial juror and he could give a fair trial to both the State and the Defense. This argument is without merit.
While the defendant testified as to his version of the events involving Ms. Cruz as the alleged perpetrator of the murder and arson, the record is not sufficient to determine defendant’s claims regarding trial counsel’s failure to make a closing argument or the impact the .verbal altercation between defendant and trial counsel had on defendant’s- case. Accordingly, these two specific claims are referred to post-conviction relief proceedings, if any.
Errors Patent
The record was reviewed for error's patent, according to the mandates of La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Wetland, 556 So.2d 175 (La. App. 5 Cir. 1990). The following errors patent require corrective action,
There are discrepancies between the sentencing ' transcript. and the uniform commitment order. First, the uniform commitment order reflects the date of the offenses as April 25, 2011, However, the record shows the correct dates of the offenses as April 24, 2011, for counts two and three; April 25, 2011, for counts one, four, and five; April 26, 2011, for count six, and April 2011 for count seven.
Second, the uniform commitment order only réflects that defendant’s sentences on counts four, five, and seven are to run “concurrent.” However, the sentencing transcript reflects that the trial court ordered that count two run consecutively to count one; count three run concurrently with count two but consecutively to counts one, four, and five; counts four, five, and seven run concurrently with all sentences; and count six run consecutively to all counts. If a discrepancy exists between the commitment and the transcript, the transcript | ai prevails. State v. Lynch, 441 So.2d 732, 734 (1983). Accordingly, we remand this matter and order the trial court to correct the uniform commitment order to correctly reflect the correct dates of the offenses and to correctly reflect which sentences are concurrent or consecutive to the other sentences. We further order the Clerk of Court for the 24th Judicial District Court to transmit the corrected uniform commitment order to the officer in charge of the institution to which defendant has been sentenced and the Department of Corrections’ legal department. See State v. Lyons, 13-564 (La. App. 5 Cir. 01/31/14), 134 So.3d 36, writ denied, 14-0481 (La. 11/07/14), 152 So.3d 170 (citing State v. Long, 12-184 (La. App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142).
*657 There are also discrepancies between the commitment and the sentencing transcript. First, while the commitment states that the jury found defendant guilty on count six, the commitment does not reflect that the trial judge imposed a sentence on count six as required by La. C.Cr.P. art, 871 A.[32] The sentencing transcript, however, reflects that the trial judge imposed a sentence on count six, ie,, twenty years at hard labor. Thus, we remand and order the trial court to amend the commitment to reflect the imposition of defendant’s twenty-year sentence. See e.g., State v. Eugene, 03-1336 (La. App. 5 Cir. 03/30/04), 871 So.2d 584, 589, writ denied, 04-1080 (La. 11/15/04), 888 So.2d 766.
Second, while the transcript reflects that each of defendant’s sentences were to be served at hard labor, the commitment does not reflect that all of the sentences were at hard labor. Thus, we remand and order the trial court to amend the commitment to reflect that each of the seven sentences is to be served at hard labor to insure the accuracy of the record. See State v. Turner, 12-855 (La. App. 5 Cir. 05/16/13), 118 So.3d 1186, 1194.
| spAlso, defendant’s sentence on count six is illegally lenient for failure to impose the mandatory fíne. La. R.S. 14:51 provides for a fine of “not more than twenty-five thousand dollars.” A statute providing for a fine of “not more than” a specified amount, requires a mandatory fine. State v. Richardson, 09-714 (La. App. 5 Cir. 02/09/10), 33 So.3d 903, writ denied, 10-0526 (La. 10/15/10), 45 So.3d 1109. er, defendant appears indigent, Howey-as re-fleeted by his representation in this matter by the Louisiana- Appellate Project. As such, we decline to disturb defendant’s sentence. See State v. Campbell, 08-1226 (La. App. 5 Cir. 05/26/09), 15 So.3d 1076, 1081, writ denied, 09-1385 (La. 02/12/10), 27 So.3d 842.
Further, defendant’s sentence on count seven, aggravated assault with a firearm, is illegally excessive. Defendant received a ten-year sentence at hard labor for his conviction of aggravated assault with a firearm. The record reflects that this offense occurred in April 2011. At that time, La. R.S. 14:37.4 provided that “whoever commits an aggravated assault with a firearm shall be fined not more than five thousand dollars, or imprisoned for not more than five years, with or without hard labor, or both.”[33]
The law in effect at the time of the commission of the offense is determinative of the penalty which the convicted accused must suffer, and a defendant must be sentenced according to the provisions in effect at the time of the commission of the offense. State v. Sugasti, 01-3407 (La. 06/21/02), 820 So.2d 518. The imposition of a harsher sentence than that prescribed at the time the offense was committed constitutes a violation of the ex post facto clauses of both the State and Federal Constitutions. State v. Gonzalez, 15-26 (La. App. 5 Cir. 08/25/15), 173 So.3d 1227, 1239, writ denied, 15-1771 (La. 09/23/16), La. LEXIS 1955. Accordingly, we vacate defendant’s sentence on count seven, aggravated 1 ^assault with á firearm, and remand the matter to the trial court for resentencing *658 in accordance with the provisions in effect at the time of the commission of the offense.
Conclusion
For the reasons stated above, defendant’s convictions are affirmed, his sentences on counts one through six are affirmed, his sentence on count seven is vacated, and the matter is remanded for resentencing on count seven and correction of the commitment.
CONVICTIONS AFFIRMED; SENTENCES ON COUNT ONE THROUGH SIX AFFIRMED; SENTENCE ON COUNT SEVEN VACATED; REMANDED FOR RESENTENCING ON COUNT SEVEN AND FOR CORRECTION OF COMMITMENT

. On January 5, 2016, the State amended the indictment on count seven, removing the specific date of April 2, 2011, and alleging the offense occurred in April of 2011.

. Mr. Guevara-Hernandez’s address is 116 Maine Street.

. Investigator Lowe was qualified as an expert in the origin and cause of fires.

. She explained that gunshot wounds made by guns that are outside of the one to three foot range are considered distant-range wounds.

. According to the toxicology report, he had evidence of the consumption of cocaine, am *640 phetamine, and methamphetamine in his system.

. She explained that they were incised wounds, or known by its common term, a cut, which are wider than they are deep, as opposed to a stab, which is deeper than it is wide.

. David Cox, an expert in forensic DNA analysis, testified that the knife recovered from the crime scene tested positive for blood consistent with Mr. Hendricks.

. Cecilia Cruz Maize is referred to throughout the transcript as Ms. Cruz and for consistency purposes she will be referred to hereinafter as Ms. Cruz.

. She testified that she stayed with him even though he beat her because she "thought that was love” and she could not "get no better.”

. Amanda Glynn testified that in January and February 2011, defendant and Ms. Cruz (also referred to as "La-La”) lived with her. She stated that defendant and Ms. Cruz had verbal and physical arguments, always initiated by defendarit. Their relationship was abusive, and defendant would hit Ms, Cruz with "his fists, or objects, or whatever., .All the time. At least, every other day.” Ms. Cruz never fought back. On one occasion, she witnessed defendant stab Ms. Cruz with a knife and she brought her to the hospital. Defendant picked her up from the hospital. She also saw defendant with a gun that had "some kind of police stamp on” it, while he was *641 living with her. On Easter Sunday 2011, she testified that she was not at home in the morning because she was visiting her daughter in Baton Rouge. After she returned home that evening, no one came to her house that night, overnight, or early in the morning, and she did not drive defendant to Danny and Clyde’s or anywhere else, Although she wit- - nessed repeated acts of violence by defendant against Ms. Cruz, she never reported the incidents because she was afraid of defendant.

. Ms, Cruz admitted that she lied- to the people at the hospital regarding how she was injured. She did not want to get defendant in trouble and defendant picked her up from the hospital. She thought it was her fault and that she did not deserve better at the time.

. Joaii Rhode similarly testified that defendant used to beat Ms. Cruz “all the time.” She elaborated that he "pistol-whipped" her and “beat her down.” Ms. Cruz could not say anything. Ms. Rhode testified that on one occasion at her home, a few weeks prior to Mr. Hendricks death, she heard a gunshot. When she investigated the noise, she observed defendant beating Ms.- Cruz in the head with a gun. After defendant and Ms.-Cruz left, she went in the house and found a hole in her floor from the gunshot and a shell casing. Ms. Rhode did not report any beatings or the incident with the' shooting to the police because she was afraid of defendant. However, the police subsequently collected evidence from the shooting at Ms. Rhode’s house during the'course of their investigation into Mr. Hendricks' homicide.

. Mr. Abumusa also described an incident between defendant and Ms. Cruz that occurred a few weeks before he was shot by defendant. Defendant was arguing with Ms, Cruz and told her to kiss the floor. When she bent over to kiss the floor defendant hit her in the head with a baseball bat. Defendant was angry with Ms, Cruz for speaking to Mr. Abu-musa.

. Jene Rauch compared ballistics evidence from the NOPD shooting investigation from April 24, 2011, and the sho.oting at Ms. Rhode’s house and determined that, based on the cartridges recovered in both cases, the same firearm was used.

.She explained that she knew Mr. Hendricks for approximately seventeen years at the time of his death and that they spoke frequently.

.She testified that they had stopped at a convenience store and defendant pumped gasoline into the containers prior to going to Mr. Hendricks' house.

.Jeff Strohm, a custodian of records for *643 Sprint Corporation, testified that the number associated with defendant's account was (504) 600-0718 and the number associated with Mr. Hendricks' account was (504) 222-1570. The phone records showed that defendant and Mr. Hendricks communicated frequently between Easter Sunday, April 24, 2011, and the following day, April 25, 2011, the day of the murder. After 2:07 A.M. on April 25, 2011, no outgoing calls were made by Mr. Hendricks’ phone.

. Detective Goff testified that defendant was properly Mirandized before each interview and statement.

. Detective Goff testified that at some point during the interview, defendant became very agitated and Sergeant Eddie Klein took over the interview. Sergeant Klein testified that defendant "may have had a problem with women” and he thought defendant would respond to him differently. Defendant calmed down and spoke with Sergeant Klein.

. While the first two statements were not recorded, the third statement was recorded on three separate microcassettes.

. Nikki Passalaqua, a latent print examiner with the Jefferson Parish Sheriff's Office, compared defendant's fingerprints with fingerprints in a certified conviction packet, case number 07-703, wherein defendant pled guilty. She concluded that the fingerprints matched defendant.

. Defendant previously filed a pro se motion to sever the offenses, which was denied. That denial is not the basis of this assignment of error.

. The prohibition against misjoinder of offenses and improper consolidation of offenses for trial is grounded on the possible prejudice arising from a single trial on two or more offenses. The defects are not jurisdictional nor do they constitute a denial of due process. Hence, misjoinder of offenses may be waived by the failure to timely assert it by a motion to quash, and improper consolidation of offenses for trial may be waived by the failure to object.

. The supplemental notice only added exhibits to the motion and did not change it substantively.

. See State v. McGowan, 16-130 (La. App. 5 Cir. 08/10/16), 199 So.3d 1156, 1161; State v. Patin, 13-618 (La. App. 5 Cir. 09/24/14), 150 So.3d 435, 443, writ denied, 14-2227 (La. 04/22/16), 191 So.3d 1043; State v. Scie, 11-254 (La. App. 5 Cir. 12/28/11), 83 So.3d 1082, 1091 (citing State v. Gaal, 01-376 (La. App. 5 Cir. 10/17/01), 800 So.2d 938, writ denied, 02-2335 (La. 10/03/03), 855 So.2d 294).

. To the extent that defendant argues Ms. Romano’s testimony constitutes testimonial hearsay on appeal, this issue is waived because it was not presented to the trial court.

. La, ,C.E. art. 104 provides:
A. Questions of admissibility generally.— Preliminary questions concerning the competency or qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions' of Paragraph -B. In making its determination it is not bound by the rules of evidence except those with respect to privileges.
B. Relevancy conditioned on fact.—Subject to other provisions of this Code, when the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.
C. Hearing of jury.—Hearings on matters to be decided by the judge alone shall be conducted out of the hearing of- the jury when the interests of justice re- ■ quire. Hearings on the admissibility of confessions or admissions by the accused or evidence allegedly unlawfully obtained shall in all cases be conducted out of the hearing of the jury, but when there has been a ruling prior to trial, it shall not be necessary to conduct another hearing as to admissibility before presentation of the evidence to a jury.
D.Weight and credibility.—The preliminary determination by the court that evidence is admissible does not limit the right of a party to introduce evidence relevant to weight or credibility ' at the trial.

. Ms. Romano also had a second conversation with Mr. Hendricks; however, the objection to this conversation was withdrawn by . defense counsel based on the trial court's admission of the first statement, The State said it would forego its argument on the admissibility of the second statement based on the defendant wanting the second statement in based on the admission of the first conversation by the trial court. The State noted that “any issue that's reviewed later should be limited to whether or not that first statement is properly admitted.” Thus, the second conversation is not before this Court on appeal.

. Also, Mr. Hendricks’ phone records indicated that this conversation with Ms. Romano began at 7:01 P.M. and that communications between Mr, Hendricks and defendant did not occur between 3:00 P.M. and 6:30. P.M., which would be. consistent with defendant and Mr. Hendricks being together during that time.

. Defendant also mentions that his convictions were based on ineffective assistance of appellate counsel. However, he does not discuss how her assistance was ineffective. U.R.C.A., Rule 2-12.4 requires that all assignments of error must be briefed or the appellate court may consider the assigned error as abandoned. Thus, defendant's argument pertaining to the ineffectiveness of his appellate counsel is deemed abandoned. See State v. Jacobs, 07-887 (La. App. 5 Cir. 05/24/11); 67 So.3d 535, 588, writ denied, 13-1753 (La. 02/10/12); 80 So.3d 468.

. The State agreed to leave' the courtroom during the court’s discussion with defendant and his trial counsel wherein defendant’s language and behavior during a break was discussed.

. La. C.Cr.P, art 871 A provides: "A sentence is the penalty imposed by the court on a defendant upon a plea of guilty, upon a verdict of guilty, or upon a judgment of guilt. Sentence shall be pronounced orally in open court and recorded in the minutes of the court.”

. La. R.S. 14:37.4 was subsequently amended by Acts 2012, No. 320, which increased the sentencing exposure to not less than ten years. The amendment became effective May 25, 2012, after the commission of the present offense.